455 So.2d 330 (1984)
Theodore Robert BUNDY, Appellant,
v.
STATE of Florida, Appellee.
No. 57772.
Supreme Court of Florida.
June 21, 1984.
Rehearing Denied September 24, 1984.
*334 Robert Augustus Harper, Jr., Tallahassee, for appellant.
Jim Smith, Atty. Gen. and David P. Gauldin, Asst. Atty. Gen., Tallahassee, for appellee.
BOYD, Justice.
This cause is before the Court on appeal from a circuit court judgment adjudicating Theodore Robert Bundy guilty of two counts of first-degree murder, three counts of attempted first-degree murder, and two counts of burglary. For the two crimes of first-degree murder the trial judge imposed sentences of death. Therefore this Court has jurisdiction of the appeal. Art. V, § 3(b)(1), Fla. Const.
During the early morning hours of Sunday, January 15, 1978, an intruder entered the Chi Omega sorority house, adjacent to the campus of Florida State University in Tallahassee, and brutally attacked four women residing there. Margaret Bowman and Lisa Levy were killed, and Kathy Kleiner and Karen Chandler sustained serious injuries. Within approximately an hour of the attacks in the Chi Omega house, an intruder entered another home nearby and attacked a woman residing there, Cheryl Thomas. All five women were university students. All were bludgeoned repeatedly with a blunt weapon.
The evidence presented at trial tending to prove that appellant Bundy was the intruder at both crime scenes and the perpetrator of the two murders and three nearly fatal beatings comprised numerous elements, some of them being direct and others being circumstantial evidence. The principal items of evidence were: (1) the identification testimony of a resident of the Chi Omega sorority house who briefly saw Bundy in the house; and (2) expert analysis of teeth marks left by the perpetrator on the body of one of the sorority house victims and comparison of the marks with the teeth of appellant. Auxiliary and corroborative items of evidence included: the closeness in time and similarity of the sorority house attacks and the subsequent attack; expert comparison of hairs found in the apartment of Cheryl Thomas with hairs from the head of Bundy; the presence of Bundy in the immediate neighborhood of the Chi Omega house a few hours before the murders; the presence of Bundy on the front porch of his rooming house, also in the same vicinity, about an hour after the second intrusion and attack; two instances of flight in response to the approach of police officers in the weeks following the crimes; and certain incriminating statements of appellant. These various individual items of evidence, along with others, will be set out in the context of the following factual narrative. Taken together, the evidence constitutes legally sufficient proof of Bundy's guilt on all the charges.

FACTS
The evidence that was placed before the jury at the trial established the following facts. On January 7, 1978, appellant rented a room at The Oak, a rooming house near the Florida State University campus. One week later, during the evening hours of Saturday, January 14, Bundy was seen in a barroom adjacent to the campus and next door to the Chi Omega sorority house. Three women testified that they were in the bar that night, and two of them identified appellant as having been there.
At approximately 3:00 a.m. on Sunday, January 15, 1978, Chi Omega house resident Nita Neary arrived home from a date and entered the house by the back door. She proceeded toward the front entrance hall of the house, where the main stairway was located. While moving through the house toward this front entrance hall, she heard the sounds of someone running down the stairs. When she arrived at the front entrance hall, Ms. Neary saw a man standing at the front door. The man held a club in his right hand, had his left hand on the doorknob, and was in the process of leaving *335 the house. Ms. Neary saw a right-side profile of the man's face. She was able to look at him for several seconds before he left.
Nita Neary then went upstairs to her room, awakened her roommate, and told her what she had seen. Ms. Neary described the intruder and at trial her roommate testified concerning this initial description. Ms. Neary told her roommate that the man wore light-colored pants, a dark jacket, and a skiing cap, had a protruding nose, and carried a large stick with cloth tied around it. After some discussion among Ms. Neary, her roommate, and another house resident about whether to report the incident to the police, beating victim Karen Chandler came out of her room. The other women could see that she had been injured so they summoned medical help and the police. The severity of the intruder's actions was soon discovered: Lisa Levy and Margaret Bowman had been killed; Karen Chandler and Kathy Kleiner had been severely beaten. The surviving victims were attacked in their sleep and could not describe their attacker.
Lisa Levy and Margaret Bowman were killed by strangulation after receiving severe beatings with a length of a tree branch used as a club. Margaret Bowman's skull was crushed and literally laid open. The attacker also bit Lisa Levy with sufficient intensity to leave indentations which could clearly be identified as human bite marks. In the course of their investigation police technicians made numerous photographs of the bite on the victim's body.
One of the officers dispatched to the scene took a description of the intruder from Nita Neary. The officer testified at trial that Ms. Neary described the intruder as a young white male, cleanshaven, with a dark complexion, about five feet, eight inches tall, weighing about 160 pounds, wearing a dark toboggan cap, a dark waist-length jacket, light-colored pants, and carrying a large stick.
While the police were taking statements and searching for evidence at the Chi Omega house, another attack was taking place only a few blocks away. At about 4:00 a.m. on Sunday, January 15, 1978, two residents of a duplex apartment on Dunwoody Street near the Florida State University campus heard loud noises coming from the adjacent apartment of the duplex house. They telephoned their next-door neighbor, Cheryl Thomas, and received no answer, so they called the police. The police arrived, entered the apartment, and discovered the severely beaten Ms. Thomas lying in her bed. She had been attacked in her sleep and could not describe or identify her attacker. A knotted pair of pantyhose, which did not belong to Cheryl Thomas, was found in the room. There were holes in the fabric the placement of which indicated that the pair of pantyhose might have been used as a mask.
At approximately 5:00 a.m. on Sunday, January 15, two men who knew appellant arrived at The Oak rooming house and proceeded inside to the room where one of the men lived. They saw Bundy standing in front of the house and looking off in the distance in the direction of the Florida State University campus and the scenes of the crimes. As they passed him both men casually greeted appellant but he did not respond. Several hours later, at about noon on Sunday, several residents of The Oak, Bundy among them, were discussing the news of the crimes. One witness testified that during this conversation he speculated that the perpetrator was "some lunatic" who was "now probably hiding out real scared." Bundy disagreed, saying that the crimes were "a professional job" and that the killer was someone who had committed such crimes before and had probably already departed the area.
On Sunday, January 15, Nita Neary met with investigators and again described the man she saw in the foyer of the sorority house. The police arranged for an artist to make sketches based on Ms. Neary's description and the sketches made at this time were admitted into evidence. One week later, Ms. Neary was placed under hypnosis and questioned concerning what *336 she had seen. During the hypnosis session, Ms. Neary said she had seen brown hair hanging out of the back of the man's ski cap. This and a reference to the man's eyebrows were the only factual elements obtained through hypnosis that had not already been learned from Ms. Neary's previous descriptions. At trial she testified that after the hypnosis session she did not remember seeing the brown hair or eyebrows on the night of the crimes.
In April, 1978, an investigator from the Leon County Sheriff's Department went to Muncie, Indiana to conduct a photographic identification array procedure with Nita Neary. At this time, appellant was in custody. The detective had cautioned Ms. Neary to avoid looking at news media photographs as well as news reports to the effect that Bundy was a principal suspect. Ms. Neary selected Bundy's photograph from the array. In her testimony at trial, Nita Neary described the man she had seen as being a white man in his twenties, about five feet, eight inches tall, weighing about 165 pounds, and having a prominent nose with a straight bridge that came almost to a point. He was cleanshaven, had thin lips, and was slightly dark in complexion. She said she saw his face from the right side and that he wore a dark blue ski cap pulled down to his eyebrows and over his ear, a dark waist-length jacket, and light-colored pants. Finally, at trial Nita Neary pointed to Bundy as the man she saw in the sorority house.
At about 1:45 a.m. on February 11, 1978, a Tallahassee police officer saw Bundy standing beside a car on a street in the same campus neighborhood where both crime scenes and The Oak rooming house are located. The officer approached appellant and asked him what he was doing there. During their conversation the officer saw an unexpired automobile license plate inside the car and asked to see it. Bundy complied and the officer walked to his police car to call the tag number in by radio. As he did so, Bundy ran away and the officer was unable to pursue him.
Bundy was arrested in Pensacola on February 15, 1978 under the following circumstances. At about 1:30 a.m. on February 15, a Pensacola police officer stopped the car being operated by Bundy and attempted to arrest him. Although the reason for the arrest and the charge made were kept from the jury at trial, it is apparent from the record that Bundy was charged with car theft when originally arrested. As the officer tried to handcuff Bundy, he struck the officer and fled. The officer fired at Bundy, then pursued, overtook, and subdued him. On the way to the jail Bundy told the officer that he wished the officer had killed him and then asked, "If I run at the jail, will you shoot me then?"
A forensic hair and fiber analyst testified that she removed several human head hairs from the knotted pantyhose found in Cheryl Thomas' room and subjected them to microscopic examination and comparison with sample hairs from the head of Bundy. The expert concluded that the human hairs found on the pantyhose had the same characteristics as Bundy's and could have come from him.
There was testimony from a forensic dental expert who testified concerning his analysis of the bite mark left on the body of Lisa Levy, his comparison of the mark with appellant's teeth, and his conclusions. Among the photographs of the bite mark were enlargements to actual size. Pursuant to a judge's warrant, law enforcement authorities arranged for the dental expert to take wax impressions and photographs of appellant's teeth. From the wax impressions, actual models of the two rows of teeth were cast. The expert testified that he was able to look at the particular features of the teeth and compare them to the indentations in the victim's flesh as revealed in the photographs. The expert described his technique and his analysis in detail. His materials were exhibited to the jury. He expressed to the jury his opinion that the indentations on the victim's body were left by the teeth of Bundy. Another forensic dentist came to the same conclusion using computer-enhanced photographs of the bite marks. Like the first expert, *337 the second expert explained the theory of his comparison. Both experts explained that because of the wide variation in the characteristics of human teeth, individuals are highly unique so that the technique of bite mark comparison can provide identification of a high degree of reliability.
The evidence was sufficient to support the convictions on all counts. We now proceed to consideration of Bundy's points on appeal.

ISSUES ON APPEAL OF THE CONVICTIONS
As his first point on appeal Bundy argues that the trial judge applied legally erroneous standards in ruling on defense motions to exclude the public and press from certain pretrial hearings, particularly the hearing on the admissibility of the bite-mark evidence and expert comparison testimony, with the result that the judge improperly refused to close the hearings and thereby violated Bundy's right to a fair trial. In considering the motions the trial judge held that there was a presumption in favor of open access to judicial proceedings and found that the defendant had failed to establish that closure was necessary. Bundy argues that the trial judge failed to accord sufficient importance to his right to be tried by a jury free from the improper prejudicial effects of pervasive pretrial publicity.
In ruling on the requests for closure of hearings, the trial judge used a three-step inquiry that had developed from cases of judicial prior restraint of dissemination of information about court proceedings. See Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); State ex rel. Miami Herald Publishing Co. v. McIntosh, 340 So.2d 904 (Fla. 1977). Bundy argues that the standards developed in cases of prior restraint are inapplicable to the question of closure of pretrial evidentiary hearings when necessary to prevent public dissemination of information likely to affect the ability to empanel an impartial jury.[1]
The appellate courts of Florida, in grappling with the problem of prejudicial pretrial publicity, have widely taken the view that closure of judicial proceedings must meet the same strict judicial scrutiny as orders of prior restraint since the effect on the ability of the press to disseminate information about court proceedings is roughly the same. Therefore, because of the importance of freedom of expression and because of the societal interest in openness of court proceedings, Florida courts have held that denial of access to court proceedings or records for the purpose of protecting the interests of parties to litigation may only be ordered after finding that the following three-pronged test has been met. It must be shown that (1) the measure limiting or denying access (closure or sealing of records or both) is necessary to prevent a serious and imminent threat to the administration of justice; (2) no less restrictive alternative measures are available which would mitigate the danger; and (3) the measure being considered will in fact achieve the court's protective purpose. See, e.g., Miami Herald Publishing Co. v. Chappell, 403 So.2d 1342 (Fla. 3d DCA 1981); Ocala Star Banner Corp. v. Sturgis, 388 So.2d 1367 (Fla. 5th DCA 1980); Sentinel Star Co. v. Edwards, 387 So.2d 367 (Fla. 5th DCA 1980), rev. denied, 399 So.2d 1145 *338 (Fla. 1981); Sentinel Star Co. v. Booth, 372 So.2d 100 (Fla. 2d DCA 1979); Miami Herald Publishing Co. v. State, 363 So.2d 603 (Fla. 4th DCA 1978); News-Press Publishing Co. v. State, 345 So.2d 865 (Fla. 2d DCA 1977); Miami Herald Publishing Co. v. Collazo, 329 So.2d 333 (Fla. 3d DCA), cert. denied, 342 So.2d 1100 (Fla. 1976); State ex rel. Gore Newspapers Co. v. Tyson, 313 So.2d 777 (Fla. 4th DCA 1975) (court could not close divorce trial simply on request of both parties), overruled on other grounds, English v. McCrary, 348 So.2d 293 (Fla. 1977) (error in closing divorce proceeding without valid reasons did not deprive court of jurisdiction so as to afford news media the remedy of prohibition). Under this three-pronged test used by the trial court, Bundy failed to establish that closure was necessary and proper. The trial judge's ruling was well within his discretion.
Appellant, in arguing that prior restraint standards should not have been used, relies upon a decision of the United States Supreme Court that has been rendered since the time of the trial court's ruling on the motion for closure. In Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), the Court focused on the problem of public dissemination of information concerning pretrial hearings on suppression of evidence and its effect on potential jurors. Public access to and press dissemination of incriminating evidence that may be ruled inadmissible for trial purposes may have the effect of informing so many potential jurors of prejudicial material that a fair trial in the community is impossible. The Court in Gannett recognized closure of pretrial evidence-suppression hearings as an effective method of preserving the right to an impartial jury. Viewing the sixth amendment in its historical context, the Court concluded that the constitutional provision created no right in favor of the public or press to attend pretrial judicial proceedings. The public and press do have, the Court said, a nonconstitutional common law right to attend court proceedings, but this public interest is not of the same stature as the fundamental constitutional right of the accused to a fair trial and an impartial jury. As for the rights of the public and press under the first amendment, the Court held that the trial court's action did not violate them since the withholding of information was only temporary.
This Court recently adopted a modified version of the three-pronged inquiry, which somewhat relaxes the test for the propriety of closure of pretrial proceedings and temporary sealing of records. In Miami Herald Publishing Co. v. Lewis, 426 So.2d 1 (Fla. 1982), we concluded that the nonconstitutional interests of the public and press in access to pretrial proceedings should not be elevated to a level of equal importance with the fundamental constitutional right of an accused to a fair trial by an impartial jury in the county where the crime was committed. Thus any balancing test must be applied with recognition of the fact that in such a clash of interests, the weightier considerations are with the accused defendant. We modified the three-pronged test, saying that one who seeks to close a pretrial proceeding or seal the record thereof in a criminal case must establish: (1) that closure is necessary to prevent a serious and imminent threat to the administration of justice; (2) that no alternative measure is available, other than a change of venue, to protect the defendant's right to a fair trial; and (3) that closure would be effective in protecting the rights of the accused without being broader than necessary to accomplish this purpose. We find that even under the modified test, the trial court's refusal to close hearings does not appear on the record to have been an abuse of discretion.
Although Miami Herald Publishing Co. v. Lewis points out that a change of venue should not automatically be considered a proper alternative to closure where the accused has invoked his constitutional right under article I, section 16, Florida Constitution, to be tried in the county where the crime was committed, the court there recognized that a change of venue is *339 one of a variety of remedies available when pretrial publicity has made the empaneling of an impartial jury difficult. It is important to note in the present case that when Bundy eventually moved for a change of venue on the ground that an impartial jury could not be selected in Leon County, the motion was granted. Moreover, certain crucial pretrial hearings on suppression of evidence were held in Dade County after the jury had been selected and sequestered. In addition, individual voir dire of prospective jurors was utilized in the jury selection process. Thus the trial court used a combination of alternative measures as remedies for the possible improper prejudicial effects of pretrial publicity. It was within the discretion of the trial judge to use these reasonable alternative remedies instead of barring public access to pretrial proceedings. The combination of remedies used was sufficient to guarantee Bundy's right to a fair trial before an impartial jury. We therefore find his argument to be without merit.
As a separate point on appeal, Bundy also argues that because of the asserted erroneous failure or refusal of the trial court to protect his right to a fair trial by controlling the pretrial publicity, he was forced to request a change of venue and therefore was deprived of the right to be tried in the locality where the crimes charged were committed. This argument presents no basis for relief from the trial court judgment. Bundy did not raise this issue in the court below; he never invoked his right to be tried in the county where the crimes were committed. The venue was changed in direct response to appellant's own request. By asking for a change of venue, Bundy waived his right to be tried in Leon County. See Ashley v. State, 72 Fla. 137, 72 So. 647 (1916) (dicta). Bundy suggests that had the trial court in Leon County better controlled the publicity a change of venue would not have been necessary, but there is nothing in the record to show that the trial court's actions could have had more than only a marginal effect on the nature and extent of the publicity concerning the case. We believe the judge succeeded in controlling the impact of that publicity on the conduct of the trial. Because the defense asked for a change of venue and was given it, the ruling can be no basis for a reversal now.
Next appellant contends that the eyewitness identification testimony of Nita Neary should have been excluded from evidence because prior to trial she was hypnotized for the purpose of improving the quality and detail of her recollection of the man she saw leaving the sorority house. Bundy argues that such hypnotically aided testimony must be regarded with caution by courts because of certain scientifically recognized dangers of unreliability due to the suggestibility of persons under hypnosis. He points out that the hypnosis session here was conducted without following all the safeguards that have been recognized by many courts as desirable to ensure the reliability of such testimony.
Nita Neary was placed under hypnosis on January 23, 1978, about one week after the incident. The hypnosis session was conducted by a police hypnotist and was attended by the sheriff of Leon County. The hypnotic examination was recorded but only on audio-tape. At a pretrial hearing on the motion to exclude Nita Neary's testimony the defense presented the testimony of a psychologist who was an expert in the field of hypnosis. The tape recording of the hypnosis session was played for the court and the defense expert pointed out numerous instances of suggestiveness on the part of the hypnotist. While Ms. Neary was in the hypnotic trance the hypnotist in effect persuaded her to "see" and recall matters which she previously had said she had no knowledge of. The defense expert testified that it is possible for a hypnotized subject to simply create plausible "memories" in response to such subtle pressure from the hypnotist. Before being hypnotized Ms. Neary had said that the man's cap was pulled down completely over the hair and ears. Her description did not include reference to the eyebrows. The transcript reveals, however, that while under *340 hypnosis Ms. Neary, after some prodding by the hypnotist, said that she could remember seeing hair hanging out of the back of the cap and that the hair was brown. She also said that the eyebrows were brown. After eliciting these responses, the hypnotist told Ms. Neary that she would retain her newly discovered memories of these details. This was identified by the defense expert as an improper and dangerous suggestion. At the same hearing, however, Nita Neary testified that although the hypnosis session made her memory seem clear at the time, it did not ultimately add to or change the way she recalled the events of January 15, 1978.
The trial court concluded that any suggestiveness that was injected into the hypnosis session had no impact on the prosecution of Bundy since he was not a suspect at the time of the hypnosis session. The record of the hypnotic interview seems to show that the police hypnotist was trying to elicit a description of a man who at that time  one week after the crimes  was considered a suspect in the case. This other man was a student who worked as a server and maintenance man at the sorority house. During the hypnosis session it was revealed that upon seeing the intruder Ms. Neary initially thought of this other man since he was the only man permitted on the upper floor of the sorority house. The trial court also found that the hypnosis session, although it brought out certain details which may have been the product of suggestiveness, did not materially change Ms. Neary's description of the man she saw. The court found further that her description after the hypnosis session was consistent with her descriptions given before and that her description and identification testimony were based on her independent recollection of the event untainted by any impropriety inherent in the hypnosis session.
The use of hypnosis in connection with the presentation of eyewitness testimony in court has been the subject of much judicial discussion in recent years. The recent judicial treatment of the subject reveals a growing recognition that hypnosis is not widely accepted by psychiatrists and psychologists as a consistently reliable method of refreshing or enhancing a person's memory of past perceptions and experiences. Where the fact of hypnosis is relied upon by a party to explain how an enhanced recollection of past events was obtained or to bolster the credibility of a witness through reference to hypnotic memory enhancement as a scientific technique, many courts have held that the admissibility of the evidence must be tested under Frye v. United States, 293 F. 1013 (D.C. Cir.1923). Frye is widely used by courts to determine the admissibility of evidence derived from new scientific tests and techniques and holds that such tests must have achieved general acceptance by scientists in the relevant field before their results may be admitted into evidence.
Some jurisdictions in recent years have held that the testimony of witnesses previously hypnotized and examined under hypnosis concerning the events about which they are to testify is inadmissible per se, either on the ground that the technique of hypnotic memory enhancement has not been established as reliable under Frye or because the scientifically recognized dangers of unreliability of such testimony outweigh its probative value as a matter of law, or for a combination of such reasons. See, e.g., People v. Shirley, 31 Cal.3d 18, 641 P.2d 775, 181 Cal. Rptr. 243, cert. denied, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); People v. Gonzales, 415 Mich. 615, 329 N.W.2d 743 (1982); State v. Mack, 292 N.W.2d 764 (Minn. 1980).
The courts of other jurisdictions have held that hypnotically aided testimony is admissible, but only if certain strict safeguards in hypnotic procedure, calculated to minimize the recognized dangers of unreliability, are followed. See, e.g., People v. Smrekar, 68 Ill. App.3d 379, 385 N.E.2d 848 (1979); Collins v. State, 52 Md. App. 186, 447 A.2d 1272 (1982); Polk v. State, 48 Md. App. 382, 427 A.2d 1041 (1981); State v. Hurd, 86 N.J. 525, 432 A.2d 86 (1981).
Still other courts have held that hypnotically refreshed testimony is generally admissible *341 and that the recognized problems inherent in its use relate to the weight and not the admissibility of such evidence. Declining to mandate specific safeguards as prerequisites of admissibility, such courts have advised that careful procedures should be used but have held that the procedures used also go to the credibility rather than the admissibility of the testimony. See, e.g., Pearson v. State, 441 N.E.2d 468 (Ind. 1982); Morgan v. State, 445 N.E.2d 585 (Ind. App. 1983); State v. McQueen, 295 N.C. 96, 244 S.E.2d 414 (1978); Chapman v. State, 638 P.2d 1280 (Wyo. 1982).
In People v. Shirley, the California Supreme Court provided a detailed analysis of the use of hypnosis as evidence and the various factual circumstances in which the issue arises. The court held that the Frye rule is applicable to hypnotically refreshed testimony and that the proponent of such testimony has the burden of establishing that the Frye test has been met. The court found that hypnosis had not been recognized by experts in the field as a reliable technique for improving memory. Since the technique has not achieved general acceptance for such purposes among scientists in the field the court held the testimony of previously hypnotized witnesses inadmissible. Implicit in the decision, however, was concern for the danger of injecting erroneous information into the subject's testimony and reinforcing it against cross examination. So the court held that a previously hypnotized witness should be considered forever tainted as a witness to the events that were the subject of the hypnotic interview.
The First District Court of Appeal of Florida recently addressed the question at length in Brown v. State, 426 So.2d 76 (Fla. 1st DCA 1983). In a thorough and persuasive opinion the court discussed the factors which experts identify as contributing to the unreliability of recall testimony brought out through hypnosis but nevertheless held that such testimony need not strictly meet the requirements of Frye as long as safeguards are followed to assure reliability and avoid the recognized dangers of potential improper prejudice. Without mandating that all the enumerated safeguards must be followed in order for the testimony to be admitted, the court suggested that they should be considered in determining the reliability of the testimony, which requires a process of weighing its relevancy against the danger that its probative value will be outweighed by its improper prejudicial effect. The court also put the burden on the proponent of the hypnotically aided testimony "to demonstrate that the hypnosis session and use of that evidence will not cause undue prejudice or mislead the jury." 426 So.2d at 91. Thus the court drew both upon those authorities which hold that strict procedural safeguards are required and those which view the fact of hypnosis as essentially a matter of the credibility of the witness rather than the admissibility of the testimony. The court reversed and remanded for a new trial on the ground that the trial court had erred in refusing to grant the accused a continuance to prepare to defend against the testimony obtained by hypnosis since the hypnosis session was held only four days before trial and without notice to the defendant.
Under the circumstances of the present case, we are not called upon to decide whether the enhancement of a subject's memory by hypnosis is a species of evidence that must meet the Frye test of general scientific acceptance in order to be admissible. (In Brown, the district court of appeal pointed out that Frye has never authoritatively been adopted by the courts of Florida as the test for the admissibility of scientific evidence generally.) Nor is it necessary for us to decide whether the admissibility of hypnotically refreshed recall testimony should be governed by the "relevancy approach" of Brown v. State, nor whether the failure to follow the safeguards that have been prominently discussed in many recent cases from around the nation renders such testimony inadmissible. It is not necessary for us to decide these questions because this is simply not a case of hypnotically refreshed recall testimony, properly understood.
*342 As the pretrial and trial testimony showed, Nita Neary was hypnotized at a very early stage in the investigation, about one week after the crimes, before Bundy's arrest, and before he came to be considered a suspect. She was hypnotized because some of those involved in the investigation believed that the visual image she remembered from seeing the intruder could be re-created and enhanced if she were placed in a hypnotic trance. Thus they hoped to gain more information about and a better description of that person so they could proceed with their investigation. According to the scholarly works discussed in People v. Shirley, Brown v. State, and many other recent opinions of various courts, the great weight of scientific opinion appears to be that such a belief  that a subject can be made to re-experience a visual perception under hypnosis  is to be considered highly suspect if not clearly erroneous. Nita Neary testified that while she was under hypnosis her memory seemed clear and her concentration seemed focused. The tape of the hypnotic session showed the suggestions she was given by the police hypnotist who was apparently trying to elicit a statement implicating the sorority house maintenance man. But as Ms. Neary testified and as the trial court found, the hypnotic session did not add to or change her essential description of the man she saw. From the time of her initial statements on the morning of the crimes, through all her interviews by police, through all her pre-trial statements, up to and including her in-court description of the man she saw, Ms. Neary's description remained substantially consistent. The scientific literature indicates that suggestions from the hypnotist or creations of the subject in response to pressure from the hypnotist may be so firmly incorporated into the subject's memory that it is impossible to trace them to their origins and impossible to undermine them by cross examination. This is one of the problems leading many courts to declare hypnotically aided testimony inadmissible per se. However, this obviously did not happen here. The tape of the hypnotic session showed that Ms. Neary tried to resist the pressures of the hypnotist and when he persisted, she expressed confusion, which he then "commanded" her not to feel. Ultimately Ms. Neary repudiated any independent personal knowledge of the details elicited during the hypnotic trance. The trial judge was satisfied that her trial testimony was based on her own recollection unaffected by the hypnotic experiment.
This is not a case where the state relied at trial on the technique of hypnosis to show how an improved recall of past events was obtained. It is not a case where the state sought to present an expert to state an opinion as to the accuracy or reliability of testimony derived from a hypnotic examination. It is not a case where the state sought to refer to the technique of hypnosis to bolster the credibility of a previously hypnotized witness. The matter of the hypnosis was only raised by the defendant's motion to suppress Nita Neary's testimony. The state elicited testimony from her at trial about the hypnosis only in anticipation of the defense attack on her credibility. It is for these reasons that we do not believe the question of the reliability of hypnotically refreshed testimony or the test by which its admissibility should be judged is even presented. Under these circumstances, we do not hesitate to hold that the fact that the hypnosis took place was a matter relating only to the weight of the testimony and not to its admissibility. Furthermore, under these circumstances the burden was on the defense to establish that the hypnosis rendered the testimony so unreliable as to be inadmissible and this it failed to do. See United States v. Awkard, 597 F.2d 667 (9th Cir.) (mere fact of hypnosis affects credibility of testimony but not admissibility), cert. denied, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); State ex rel. Collins v. Superior Court, 132 Ariz. 180, 644 P.2d 1266 (1982) (previously hypnotized witness not disqualified from testifying to matters he was able to recall and relate prior to hypnosis); People v. Lucas, 107 Misc.2d 231, 435 N.Y.S.2d 461 (Sup.Ct. 1980) *343 (even where safeguards lacking, witness could testify because hypnosis had little impact and pre- and post-hypnosis statements were substantially similar).
As was stated above, prior to trial the defense presented an expert to testify about the problems inherent in hypnosis as an aid to recollection and to point out the actual instances of suggestiveness and pressure revealed by the tape of the hypnosis session. At the trial proper the defense declined to use its expert, choosing instead to simply play the tape of the hypnosis session for the jury. Thus the circumstances of the hypnosis and the procedure used were fully disclosed to the jury and the defense had every opportunity to attack the credibility of Nita Neary based on the fact that she had been hypnotized.
The trial judge was satisfied that Nita Neary's testimony was based upon her independent recollection untainted by any improper suggestions the hypnotist's prodding may have tended to plant. Reviewing the trial judge's determination in light of the massive pretrial and trial record pertaining to this issue, we find that the trial judge did not abuse his discretion by so ruling. We therefore find appellant's contention to be without merit.
Appellant also questions the admissibility of Nita Neary's identification testimony on another ground. He argues that his right to due process of law was violated because before trial an impermissibly suggestive photographic selection procedure was used which affected Ms. Neary's testimony to appellant's prejudice. Such a contention calls for the application of a two-pronged test inquiring into (1) whether the police used an impermissibly suggestive procedure in obtaining the identification and (2) if so, whether that suggestive procedure gave rise to a substantial likelihood of an irreparable mistaken identification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). We find that neither requirement is satisfied.
Specifically, Bundy claims that the police used an impermissibly suggestive procedure in having Ms. Neary choose his picture from an array of photographs. He argues that the procedure used resulted in a substantial likelihood of misidentification because of a suggestive comment made by the officer while showing the array of photographs and because she may have been influenced by seeing pictures of Bundy in a newspaper prior to choosing his photograph from the array. The suggestive comment complained about was the police officer's asking her to select the photograph of the person that resembled the suspect. This remark implying that the suspect's picture was included in the array of ten photographs did not render the procedure impermissibly suggestive. State v. Colby, 361 A.2d 256 (Me. 1976); Commonwealth v. Bumpus, 362 Mass. 672, 290 N.E.2d 167 (1972), vacated on other grounds, 411 U.S. 945, 93 S.Ct. 1941, 36 L.Ed.2d 407 (1973); State v. Davis, 25 N.C. App. 256, 212 S.E.2d 680 (1975); Drewry v. Commonwealth, 213 Va. 186, 191 S.E.2d 178 (1972); Fells v. State, 65 Wis.2d 525, 223 N.W.2d 507 (1974). See also Annot., 39 A.L.R.3d 1000 (1971 & Supp. 1982).
We also find that Ms. Neary's having seen pictures of Bundy in the newspaper did not render the identification procedure impermissibly suggestive. Some courts have held that the holding in Simmons, that a photographic identification will not be admissible where the procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification, does not apply to situations where a witness had earlier observed a picture of the defendant in the news media. United States v. Peele, 574 F.2d 489 (9th Cir.1978); United States v. Zeiler, 470 F.2d 717 (3d Cir.1972); Stroud v. State, 246 Ga. 717, 273 S.E.2d 155 (1980); Norris v. State, 265 Ind. 508, 356 N.E.2d 204 (1976); Sanders v. State, 612 P.2d 1363 (Okla. Crim. App. 1980). Others have found that there was not a substantial likelihood of misidentification where, as in this case, the witness asserted that seeing the suspect's picture in the news media did not *344 influence his or her identification. United States v. Grose, 525 F.2d 1115 (7th Cir.1975), cert. denied, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976); United States v. Boston, 508 F.2d 1171 (2d Cir.1974), cert. denied, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); United States v. Milano, 443 F.2d 1022 (10th Cir.), cert. denied, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 258 (1971); Fitchard v. State, 424 So.2d 674 (Ala. Crim. App. 1982). Here Ms. Neary said that the newspaper photographs had no effect on her because they were not profiles. Her view of the intruder was a profile, she said, and so was the picture she selected from the photographic line-up. Because Bundy failed to show that the police used an impermissibly suggestive procedure in obtaining an identification, we find that Ms. Neary's identification testimony was properly admitted. Grant v. State, 390 So.2d 341 (Fla. 1980), cert. denied, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981).
Furthermore, we agree with the trial court's finding that the procedures used in this case did not give rise to a substantial likelihood of misidentification. Analyzing the factors laid out in the United States Supreme Court's decision in Manson v. Brathwaite, the trial court specifically found:
The opportunity to view: the witness saw the assailant but a short time, but enough time to describe prominent, straight bridge protruding nose; dark complexion; slight built; around five eight, five foot ten; weight approximately one hundred sixty-five pounds; white male; dark jacket right below the belt; the light colored pants; wearing a stocking cap down over the eyebrows; clean shaven with no facial hair; looked in the mid-twenties. And the Court finds there was sufficient light to view.
The degree of attention: The witness in the Court's opinion was not a casual observer. She was an art student attending college and there was no surprise at the time of the view. She thought, in fact, it was a boyfriend staying over or the houseboy. She described immediately the description to a roommate and there's been no differentiation from that description since its first utterance.
Item three, the accuracy of the description: All items in the description set forth above were given and there's been no claim made before this Court that the defendant does not possess all of these physical characteristics. The defendant is slightly taller and somewhat older, but none of the predominate descriptions shown have been shown to this Court not to be descriptive.
The witness' level of certainty: No deviation by the witness since the first utterance of her description. She survived and stated these stories  this particular description to what the Court would describe as an army of police officers and hypnosis. It has always been the same. The only varying factor under hypnosis was the hair testimony that's before the Court. That was not present at the original description, but, of course, with the covered stocking cap. The hair testimony was no aid in the identification of the defendant.
The time before confrontation: The witness was shown a picture line-up on April the 7th after the defendant's arrest on February the 18th. The Court finds this not too remote for a witness in a remote jurisdiction. The description was given within minutes. The identification three months later was based on the same description and there was no material variance.
These findings support the trial court's conclusion that under the totality of the circumstances there was no substantial likelihood of irreparable misidentification.
Next Bundy argues that the trial court erred in denying his motion to sever counts six and seven, which pertained to the crimes that occurred at the duplex apartment on Dunwoody Street, from the remaining counts. He argues that these two counts were improperly joined with counts one through five which pertained to the *345 crimes occurring at the Chi Omega sorority house and that such joinder seriously impaired his right to a fair determination of guilt or innocence. We do not find the joinder of all seven counts to have been either improper or prejudicial.
Two or more offenses are properly joined if they are based "on two or more connected acts or transactions." Fla.R. Crim.P. 3.150(a). In determining whether two acts or transactions are connected for purposes of consolidation, this Court has considered the temporal and geographical association, the nature of the crimes, and the manner in which they were committed. See Ashley v. State, 265 So.2d 685 (Fla. 1972); Hall v. State, 66 So.2d 863 (Fla. 1953), cert. denied, 346 U.S. 931, 74 S.Ct. 321, 98 L.Ed. 422 (1954). Here the crimes occurred within a few blocks of each other and within the space of a couple of hours. The crimes were similar in that they involved a person entering the residences of female students in an off-campus neighborhood and beating young white women with a club as they slept. Hence the criminal acts are connected by the close proximity in time and location, by their nature, and by the manner in which they were perpetrated.
Even though two or more related offenses are properly joined, a severance should be granted upon a showing that it is necessary to promote or achieve "a fair determination of the defendant's guilt or innocence." Fla.R.Crim.P. 3.152(a). Bundy claims that he was prejudiced by the joinder because it allowed the state to introduce evidence of separate criminal offenses which otherwise would not have been admissible if a severance had been granted. We do not agree with this assumption. Even if there had been separate trials, evidence of the crimes occurring at either location would have been admissible at the trial concerning the crimes at the other location since such evidence was relevant to showing a common scheme and identity. See Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). Since the same evidence would have been admissible at either trial, Bundy has failed to demonstrate that a severance was necessary for a fair determination of his guilt or innocence. We therefore find that the trial court did not abuse its discretion in denying the motion to sever the two groups of charges.
Bundy's next point on appeal is that the trial court erred in excusing two veniremen for cause. Appellant argues that they voiced only general objections to the death penalty and therefore their dismissal violated principles announced in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A close examination of the voir dire, however, reveals that the two veniremen had more than general philosophical objections to the death penalty. When questioned by the trial judge, both stated that they would not be able to return a verdict of guilty of first-degree murder knowing that a conviction of such an offense could possibly lead to the imposition of a sentence of death. Because they acknowledged that they could not be neutral in reaching a verdict, Bundy was not denied due process of law by their excusal for cause.
The next point on appeal pertains to the denial of several pretrial motions concerning the grand jury. In February 1978, after Bundy had been arrested on some unrelated charges, a public defender's office was appointed to represent him. Between July 18 and 21, 1978, the assistant public defender assigned to represent Bundy filed motions (1) seeking information about grand jury proceedings and to record and transcribe the grand jury proceedings; (2) for orders restraining grand juries from returning indictments against Bundy; (3) seeking voir dire examination of the grand jurors; and (4) challenging the legality of the grand jury. In response the state filed a motion to quash the motions, arguing that the assistant public defender who had filed them had no authority to file the motions since they were beyond the scope of his appointment and that the motions were untimely filed since the grand jury had been impaneled on June 5. On July 21, *346 Bundy requested appointment of a public defender to handle his grand jury motions. At a hearing held on July 21, Judge John Rudd, who initially presided over the case, denied Bundy's request for the public defender and denied the motions. Three days later Judge Rudd reversed himself on Bundy's request and appointed the public defender to represent Bundy in all matters pending before the grand jury. A hearing was held on July 24 at which the assistant public defender was allowed to argue the merits of the four motions filed between July 18 and 21. The next day Judge Rudd denied the motions and in a written order filed August 1 explained his reasons. In that order he found that Bundy, by virtue of having been served with a search warrant on April 27, knew or had reason to believe that at the time the grand jury was impaneled he would be involved in its investigation. The judge concluded that the motions were untimely filed under section 905.05, Florida Statutes (1977).
Bundy later moved to quash the indictment on the grounds that he was not provided a fair hearing on these motions. A hearing on this motion was held before Judge Edward D. Cowart, who presided at trial, on May 16, 1979. At the hearing the assistant public defender who filed the earlier motions acknowledged that he had knowledge of Bundy's having been served with a search warrant and of the extensive publicity prior to the convening of the grand jury. At this hearing defense counsel announced they were abandoning all the challenges to the grand jury except the principal one which was that the grand jury was prejudiced by the extensive publicity. The trial court denied the motion to quash.
In this appeal Bundy claims that the motions filed in July of 1978 challenging or objecting to the grand jury on the ground of extensive pretrial publicity were timely since he had not actually been served with notice that the grand jury would be considering offenses which he was suspected of committing. As an alternative argument he claims that if service of a search warrant constitutes notice, he should at that time have been appointed counsel for the purpose of filing and preserving his objections to the grand jury. He argues that it was a violation of his right to due process to appoint counsel after the deadline for filing objections to the grand jury had passed. See Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955).
In Reece the defendant challenged his conviction on the ground that the grand jury was unconstitutionally selected. He had initially raised the issue by filing a motion to quash the indictment seven days after he was indicted. The Georgia Supreme Court refused to grant relief because of a rule of practice which required objections to the competency of grand jurors to be made prior to the returning of an indictment. The United States Supreme Court reversed, concluding that inasmuch as the defendant was a semi-literate person of low mental ability who was without benefit of counsel and the order by which the grand jury reconvened did not list him as a person against whom a case would be presented, the defendant had not had an opportunity to raise his objections.
This case is distinguishable because Bundy had an adequate opportunity to raise his objections in a timely manner. He had been receiving the benefit of court-appointed counsel since February and both he and the lawyer knew that Bundy was being investigated for the crimes for which he was later indicted. Both he and his attorneys had actual knowledge of the pre-indictment publicity, which was asserted as the basis for seeking a temporary restraining order and for requesting voir dire, before the grand jury was impaneled. We therefore hold there was no error in denying the motions since they were untimely filed.
Furthermore, we find Bundy would not have been entitled to any relief even if the motions had been timely filed. The motions for a temporary restraining order and for voir dire alleged that the grand jury could not act impartially because of the extensive publicity surrounding the crimes and Bundy's arrest. However, *347 the courts have held that the mere existence of pre-indictment publicity is insufficient to show that grand jurors might be prejudiced or biased. United States v. Civella, 648 F.2d 1167 (8th Cir.), cert. denied, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981); Khaalis v. United States, 408 A.2d 313 (D.C.App. 1979), cert. denied, 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980). To justify the individual examination of grand jurors the pre-indictment publicity must be so invidious as to cause vindictive and retributive feelings among the members of the community. State v. Haberski, 449 A.2d 373 (Me. 1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). We therefore find Bundy was entitled to neither a temporary restraining order nor an opportunity to voir dire the individual members of the grand jury. See Porter v. State, 400 So.2d 5 (Fla. 1981).
Appellant contends that the court improperly commented on his exercise of his right to remain silent. Bundy finds this improper reference in the very jury instruction designed to prevent any unfavorable jury inference from the fact that an accused does not testify. In accordance with Florida Standard Jury Instruction for Criminal Cases 2.13(h) the judge instructed the jury as follows:
In every criminal proceeding a defendant has the absolute right to remain silent. At no time is it the duty of a defendant to prove his innocence. From the exercise of a defendant's right to remain silent, a jury is not permitted to draw any inference of guilt, and a defendant's failure to take the witness stand must not be considered in any manner an admission of guilt, nor should his failure to take the witness stand influence your verdict in any manner whatsoever.
At trial the defense requested an alternate version of the instruction but when the judge declined to depart from the approved standard the defense reiterated its request for an instruction of some kind on this matter. The judge offered to omit the instruction but the defense wanted it.
Bundy claims that the word "failure" contained in the instruction has an unfavorable connotation and has the effect of an improper negative comment on a defendant's exercise of the right not to testify. We do not find that the use of this term creates an adverse inference that would pressure a defendant into testifying. See Lakeside v. Oregon, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). Hence there was no error in giving this instruction.
Bundy's next point on appeal is the denial of his motion to permit an out-of-state attorney to represent him pro hac vice. Bundy argues that the denial of the motion deprived him of his sixth amendment right to counsel. Both sides agree that a defendant does not have an absolute right to a particular lawyer and that it is within a trial court's discretion to deny a defendant's request for particular counsel when there is a "countervailing public interest in the fair and orderly administration of justice." United States v. Salinas, 618 F.2d 1092, 1093 (5th Cir.), cert. denied, 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980). The state argues that the trial judge did not abuse his discretion in denying the motion because of the out-of-state attorney's prior misconduct which disrupted the orderly administration of justice. See United States v. Dinitz, 538 F.2d 1214 (5th Cir.1976), cert. denied, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977); Ross v. Reda, 510 F.2d 1172 (6th Cir.), cert. denied, 423 U.S. 892, 96 S.Ct. 190, 46 L.Ed.2d 124 (1975). Bundy argues that these cases are distinguishable because the misconduct relied upon by the courts in refusing to permit the attorneys to appear occurred in their presence. Bundy points out that the misconduct complained about in this case occurred in another state, see Farmer v. Holton, 146 Ga. App. 102, 245 S.E.2d 457 (1978), cert. denied, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), and that no disciplinary proceedings were ever brought against the attorney. We do not agree that this makes a difference; the *348 courts of this state are not bound by the lack of disciplinary action in other states in determining whether an attorney should be admitted to the bar pro hac vice. See In re Rappaport, 558 F.2d 87 (2d Cir.1977). We concur with the finding of the United States Court of Appeals for the Fifth Circuit that the denial of admission to appear pro hac vice in this case was based upon a reasonably clear standard, see Bundy v. Rudd, 581 F.2d 1126 (5th Cir.1978), cert. denied, 441 U.S. 905, 99 S.Ct. 1992, 60 L.Ed.2d 373 (1979), so there was no abuse of discretion. Since the denial of the motion was not an abuse of discretion, Bundy was not deprived of his sixth amendment right to counsel.
Bundy's next point on appeal is that the trial court erred by instructing the jury that it could consider the defendant's flight in determining guilt or innocence. Bundy argues that the instruction was improper since his motivation for fleeing may have been avoidance of prosecution for a different crime of which the jury was unaware, citing United States v. Myers, 550 F.2d 1036 (5th Cir.1977). The holding in Myers, however, has been subsequently limited "to hold only that the flight instruction was erroneous `because the allegations of flight were without support in the [Myers] record.'" United States v. Kalish, 690 F.2d 1144, 1156 (5th Cir.1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983) (quoting United States v. $364,960.00 in United States Currency, 661 F.2d 319, 324 n. 13 (5th Cir.1981)). In Myers the evidence merely showed that the defendant ran when approached by a plainclothes FBI agent who had not identified himself. The court essentially found there was insufficient evidence to support the conclusion that the defendant had actually attempted to flee out of fear of apprehension. Moreover, this case is distinguishable because here there was sufficient evidence to support the conclusion that Bundy actually attempted to evade prosecution by resisting arrest. Straight v. State, 397 So.2d 903 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981). As there was sufficient evidence that Bundy attempted to avoid arrest, the trial court's instruction that the jury could consider this as a factor in determining guilt or innocence was proper.
Bundy also challenges the trial court's ruling that permitted the state to present the testimony of dental experts who analyzed the bite inflicted on murder victim Lisa Levy and compared it to the models of appellant's teeth. Before trial the defense moved to exclude such evidence on the ground that the comparison techniques were not reliable. Dental experts for the state and the defense testified at the motion hearing. After the judge ruled, the defense moved to strike the hearing testimony of one of the state's experts on the ground of prejudice and as a sanction for the expert's violation of an earlier court order restricting public disclosure of matters pertaining to the bite mark evidence.
The trial court found that the science of odontology, which is based on the discovery that the characteristics of individual human dentition are highly unique, is generally recognized by scientists in the relevant fields and therefore is an acceptable foundation for the admissibility of expert opinions into evidence. The court in effect ruled that since the profferred evidence met this criterion the details of the comparison techniques were matters of credibility and weight of the evidence for the jury to determine. The judge also found that the state expert's appearance at a forensic science conference and his mention there of his work on this case was not a willful violation of the earlier court order and did not render him prejudiced.
Appellant contends that the bite mark comparison evidence and expert testimony should not have been admitted into evidence because it was not shown that the comparison techniques were reliable and that accepted standards of comparison were used. He also argues that the state's chief expert was prejudiced and gave an improper opinion on the ultimate issue of guilt or innocence.
*349 The evidence in question is based on the examination of impressions made by human teeth and their comparison with models of known human teeth for the purpose of determining whether the impressions were or probably were or could have been made by a particular individual. Bite mark comparison evidence differs from many other kinds of scientific evidence such as blood tests, "breathalyzer" tests, and radar (as well as from inadmissible techniques such as the polygraph and voice-print analyses) in that these various techniques involve total reliance on scientific interpretation to establish a question of fact. With bite marks evidence, on the other hand, the jury is able to see the comparison for itself by looking directly at the physical evidence in the form of photographs and models. People v. Slone, 76 Cal. App.3d 611, 143 Cal. Rptr. 61 (Cal.Ct.App. 1978); People v. Marx, 54 Cal. App.3d 100, 126 Cal. Rptr. 350 (Cal.Ct.App. 1975).
As the trial court found, the basis for the comparison testimony  that the science of odontology makes such comparison possible due to the significant uniqueness of individual dental characteristics  has been adequately established. Appellant does not contest this supposition. Forensic odontological identification techniques are merely an application of this established science to a particular problem. People v. Marx. The technique is similar to hair comparison evidence, which is admissible even though it does not result in identifications of absolute certainty as fingerprints do. Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); Peek v. State, 395 So.2d 492 (Fla. 1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981). Its probative value to the case is for the trier of fact to determine.
The trial court also found that the comparison techniques actually used in this case were reliable enough to allow the experts to present their materials and their conclusions to the jury. Bundy has presented no basis for finding that the trial judge abused his discretion in doing so. The court's ruling on defendant's claim that the state's chief expert was prejudiced was also within the judge's discretion. Moreover, we find that it was proper for the expert to offer his opinion on the issue of a bite-mark match; this was not an improper legal conclusion. All facets of appellant's argument on the bite mark evidence are without merit.
At the close of the trial Bundy filed a motion for a new trial on the ground that he had received ineffective assistance of trial counsel. The court denied the motion without holding an evidentiary hearing because the request for a hearing was based on events which the court had seen and heard itself. Since Bundy failed to prove the existence of any act or omission of counsel that was below the standard of reasonably competent counsel, the court properly denied the motion. Knight v. State, 394 So.2d 997 (Fla. 1981).
We have considered each of appellant's contentions regarding the judgments of conviction and have found them to be without merit. We now proceed to consider the matter of the sentences of death.

SENTENCE
Finally we come to the sentencing phase of the trial. The state relied upon the evidence presented at trial and a stipulation that Bundy was under sentence of imprisonment for aggravated kidnapping in the state of Utah to establish the existence of various aggravating circumstances. The defense presented several witnesses who testified that Bundy could be rehabilitated and live a useful life. As aggravating circumstances the trial court found that Bundy was under sentence of imprisonment, section 921.141(5)(a), Florida Statutes (1977); that he had been previously convicted of a felony involving the use or threat of violence to a person, section 921.141(5)(b); that the capital felonies were committed during a burglary, section 921.141(5)(d); and that the capital felonies were especially heinous, atrocious, and cruel, section 921.141(5)(h). Concluding that there were no mitigating circumstances, the trial court *350 imposed two separate death sentences in accordance with the jury's recommendations.
Bundy claims that the trial court erred by considering his being under sentence of imprisonment and his prior conviction of a felony as separate aggravating circumstances. He argues that the two statutory factors were improperly doubled up under the rationale of Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). This identical issue was raised in Waterhouse v. State, 429 So.2d 301 (Fla.), cert. denied, ___ U.S. ___, 104 S.Ct. 415, 78 L.Ed.2d 352 (1983), where we stated:
The principle of Provence, however, is not applicable here. In Provence we reasoned that proof that a capital felony was committed during the course of a robbery necessarily was based on the same aspect of the crime that provided the basis for finding the motive of pecuniary gain. The same reasoning does not apply to the two aggravating circumstances in question here. The previous conviction and the parole status were two separate and distinct characteristics of the defendant, not based on the same evidence and the same essential facts. Therefore separate findings of the two factors were proper.
Id. at 307. We therefore find no error.
Next Bundy claims that the trial court erred in finding that the capital felonies were especially heinous, atrocious, and cruel. There is no merit to this argument. The victims were murdered while sleeping in their own beds. See Breedlove v. State, 413 So.2d 1 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). The trial court also recounted the gruesome manner in which the victims were bludgeoned, sexually battered, and strangled. These circumstances are more than sufficient to uphold the trial court's finding that the capital felonies were especially heinous, atrocious, and cruel. E.g., King v. State, 390 So.2d 315 (Fla. 1980), cert. denied, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (1981) (bludgeoning); Jackson v. State, 366 So.2d 752 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979) (strangulation); Goode v. State, 365 So.2d 381 (Fla. 1978), cert. denied, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979) (sexual assault); Alvord v. State, 322 So.2d 533 (Fla. 1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976) (strangulation); Alford v. State, 307 So.2d 433 (Fla. 1975), cert. denied, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976) (sexual assault).
Finally Bundy argues there was insufficient proof of nonconsensual entry to uphold the finding that a burglary had been committed. The state points out, however, that the murders were committed on the second floor of a sorority house where no men were allowed. Moreover it is inconceivable that Bundy could have been or thought he was invited to be in the house at three o'clock in the morning. We agree with the state's position that there was ample circumstantial evidence to support the finding that Bundy's entrance into the building was nonconsensual. In any event, lack of consent to entry is not an essential element of a charge of burglary; rather, consent to entry is an affirmative defense. State v. Hicks, 421 So.2d 510 (Fla. 1982).
Having reviewed the entire sentencing order, we find no errors. The sentencing court's analysis of the nature of the crimes and the character of the offender correctly concludes that sentences of death are appropriate under our law.
The judgments of conviction and sentences of death are affirmed.
It is so ordered.
ALDERMAN, C.J., and ADKINS, OVERTON, McDONALD and EHRLICH, JJ., concur.
McDONALD, J., concurs specially with an opinion in which OVERTON, J., concurs.
*351 McDONALD, Justice, concurring.
I concur with the opinion with the understanding that it does not hold that hypnosis affects only the weight and not the admissibility of testimony. Post-hypnotic testimony can be influenced by a suggestive hypnosis session to the extent that false memories are created and believed by the witness. While hypnosis is a useful investigative technique, it can be dangerous if improperly used. This danger need not render post-hypnotic testimony inadmissible per se, as some jurisdictions have held. I would adopt the test of admissibility set out by the Supreme Court of Wisconsin in State v. Armstrong, 110 Wis.2d 555, 329 N.W.2d 386, cert. denied, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983). The party seeking to offer post-hypnotic testimony would so inform the other party. If the opposing party moves to suppress, the trial court would determine admissibility at a pretrial hearing, where the proponent would have the burden of demonstrating that the hypnotic session was not impermissibly suggestive. If then admitted, the fact that hypnosis took place becomes a matter for the jury to consider in determining the credibility of that testimony.
In this case the trial judge was able to determine that the witness who had been hypnotized did not change her description of the assailant in any material way after hypnosis. The hypnotic session took place before Bundy was a suspect in this case and no suggestion, directly or indirectly, was given the witness that could have affected her testimony. Therefore, the post-hypnotic testimony was reliable and admissible under the standard I have proposed.
OVERTON, J., concurs.
NOTES
[1] A prior restraint on publication of information is, as the Supreme Court said in Nebraska Press Association v. Stuart, "one of the most extraordinary remedies known to our jurisprudence." 427 U.S. at 562, 96 S.Ct. 2791 at 2804. In that case a state trial court ordered members of the press not to divulge matters they had learned at a preliminary hearing held in open court. The Supreme Court said that such prior restraint would only be permissible upon satisfaction of a strict three-step inquiry. Without attempting to formulate precise tests for each element of the inquiry the Court found the trial court's order improper because it was not clearly supported by evidence of (1) the nature and extent of the damaging publicity, (2) whether alternative measures could be used to mitigate the harmful effects, and (3) whether the restraint would be effective to prevent prejudice. Under the circumstances the judicial remedy utilized was held unjustified when weighed against the constitutional right to freely pass on information to others.