460 So.2d 926 (1984)
Bruce Allen BRADFORD, Appellant,
v.
STATE of Florida, Appellee.
No. 83-837.
District Court of Appeal of Florida, Second District.
November 30, 1984.
Rehearing Denied December 31, 1984.
*927 Jerry Hill, Public Defender, and W.C. McLain, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Robert J. Landry, Asst. Atty. Gen., Tampa, for appellee.
SCHOONOVER, Judge.
The appellant, Bruce Allen Bradford, appeals the judgments and sentences entered against him pursuant to a jury verdict finding him guilty of first-degree murder and arson. He received a life sentence for the first-degree murder charge and a ten-year consecutive sentence for the arson charge. We affirm.
Two of the appellant's five points on appeal merit discussion. They are first, that the trial court erred in admitting bite-mark identification testimony and second, that the trial court erred in denying appellant's motion for judgment of acquittal.
The victim in this case, Brenda Clark, died early on the morning of April 27, 1982. She was beaten, strangled to death, and burned in her bed. Appellant was subsequently arrested and charged with the crimes.
The events leading up to the victim's death took place on Sunday, April 26, 1982. The victim's roommate, Sandra Grein, held a party at her apartment on Marco Island, *928 Florida. The party began around noon. The victim was at the apartment most of the day, and at one point during the afternoon her boyfriend, Ray Newman, visited her at the apartment. Mr. Newman was a retired policeman and was married to Marsha Newman. He had a reputation for being jealous of the victim and had been engaged in an affair with her for approximately two months prior to the murder.
The appellant and his neighbors, Mr. and Mrs. Al Vandermeulen, also attended the party. When the appellant began making preparations to use cocaine, the victim's boyfriend became upset and left. Shortly thereafter, the victim, who appellant later referred to as a bitch, told appellant and Al Vandermeulen to leave. They chose to remain after Sandra, the roommate, told them they could stay.
At approximately 11:30 p.m. the Vandermeulens left the party and returned to their home in Bonita Springs, Florida. Because appellant had been drinking all day and was to help Sandra move some furniture the next day, Sandra told him he was welcome to spend the night. Appellant slept on the couch in the living room. Lynn Morris, who was another guest, and her son, who had earlier been put to bed in Sandra's room, also decided to spend the night at the apartment. Ms. Morris and her son slept in Sandra's room.
At approximately 3:00 a.m., Sandra woke up to an apartment full of smoke. Upon leaving her bedroom, she noticed the apartment was in disarray. Before she could move throughout the apartment, she had to move a table and some chairs that had been overturned in the dining/living room. Appellant, who had been sleeping on the couch, was no longer in the apartment. After discovering the smoke was coming from the victim's bedroom, Sandra woke Lynn Morris and her son and got them out of the apartment to the balcony. Sandra then threw a pail of water on the victim's bed in order to extinguish the fire. She called the fire department at approximately 3:45 a.m.
When the firemen arrived, they found the victim lying on the bed with a scarf around her neck. Ordinarily, the scarf was tied to a mandolin hanging on the wall outside the door to the victim's room. The victim had been strangled with the scarf. She died before being burned but after her lower jaw had been broken in two places by blunt trauma. A trace quantity of cocaine was found in her nasal passages, and a blood alcohol test revealed the equivalent of one-half of a drink in her blood system.
Although appellant did not testify during the trial, tape recordings of statements he had given to law enforcement officers after the crime were played for the jury. Appellant stated that he had been asleep on the couch when awakened by three men. The largest man grabbed him, struck him twice in the side, and moved him toward the door while telling him to leave. Appellant struck the man once in the mouth with his right hand. Appellant's shirt was torn during the struggle. The second man pointed a gun at appellant's face and motioned for him to leave. Appellant recognized the third man as the victim's boyfriend whom he had seen at the apartment the afternoon before. Appellant left the apartment, drove the fifty-minute drive to Bonita Springs, woke up his neighbor, Al Vandermeulen, and told him what had happened.
Al Vandermeulen testified that appellant knocked on the window of his residence around 4:00 a.m. Mrs. Bradford, appellant's wife, was asleep in the adjoining duplex and testified that she was awakened by this activity at approximately 3:05 a.m. She commented that she had just set the clocks to reflect the time change because of daylight savings time. She noticed that appellant's mouth was bleeding when he entered the house.
Appellant requested that his neighbor return to Marco Island with him to be sure that the victim and her roommate were safe. The neighbor testified that he persuaded appellant not to do this. Instead, they called the apartment, but hung up when a man, who later was identified as a fireman, answered the telephone. Fire department *929 records indicated that a phone call from an unidentified male was received at approximately 4:20 a.m.
The neighbor also testified that appellant's shirt was torn, he had scrapes on his shoulder and side, and he was spitting profusely. The next day he saw scrapes on appellant's hands and observed that appellant appeared to be sore or stiff.
Ray Newman, the victim's boyfriend, denied being jealous of the victim. He testified that he was at the apartment during the party and that he left when one of the men prepared to use cocaine. He testified that he saw the victim again around 4:00 p.m. in the parking lot where they spoke briefly. He denied that he had returned to the apartment later that night and testified that he had been home all evening. His wife gave evidence to support this testimony.
The physical evidence discovered in the victim's bedroom failed to connect appellant to the crimes. One hair found under the body was similar to the head hair of the boyfriend. A blood splatter expert testified that the blood found on the wall was caused from blows to the victim's head. Although there was evidence that the victim had engaged in sexual intercourse approximately twelve hours before her death, there was no evidence of rape or sexual molestation.
An arson investigator testified that an accelerant had been used to enhance the burning. A chemical specialist found no accelerant residue on the mattress, which was determined to be the point of origin of the fire, but testified that alcohol, such as that found in liquor, could be used as an accelerant. He testified further that if diluted by water, alcohol would not leave a residue. Evidence introduced at trial indicated that two one-half gallon whiskey bottles purchased during the course of the party were nearly empty after the murder. Appellant stated that both of the bottles were almost empty when he went to sleep. Other witnesses, however, testified that the second bottle of liquor was almost full when the party ended.
A microanalyst testifying for the prosecution examined appellant's shirt and expressed his opinion that four damaged areas of the shirt, two in the area of the collar and sleeve and two across the front, had been cut and not torn. A textile engineer testifying on behalf of the appellant agreed that two of the questioned areas had been cut, but that in his opinion, the two areas across the front of the shirt had been torn. The experts disagreed concerning whether the shirt could be torn by hand.
Dr. Richard Souviron, a board-certified forensic odontologist, testified as a dental expert for the prosecution. He was qualified as an expert in forensic odontology and bite-mark analysis. In his opinion, within a reasonable degree of dental certainty and/or probability, the victim's teeth made the marks on the defendant's hand. Photographs of the defendant's hand and models of the victim's teeth and jaws were introduced into evidence and were used by the doctor in explaining his testimony.
An orthodontist testified on behalf of the appellant that although he was not an expert in forensic odontology, in his opinion, the victim's teeth had very common characteristics. Of sixty teeth molds of former patients he had examined, eighteen of those people could have made the marks. Four of the molds were introduced into evidence. A dermatologist testifying on appellant's behalf examined appellant's hand and opined that one of the marks noted by Dr. Souviron was a freckle and not an abrasion.
After lengthy deliberation, the jury found appellant guilty of first-degree murder and arson as charged. The appellant filed a timely notice of appeal.
Appellant's first argument is that the trial court erred in admitting the bite-mark identification testimony of Dr. Souviron, the odontologist. Dr. Souviron's testimony was similar to the bite-mark evidence he presented in the recent case of Bundy v. State, 455 So.2d 330 (Fla. 1984). In Bundy, *930 the supreme court approved this type of testimony, and we approve it in this case.
Dr. Souviron testified that the wounds on appellant's hand were not "bite marks" because they had not been made by someone clamping his teeth down on the hand. He stated that the wounds were "abrasion patterns" that had definitely been caused by teeth. Dr. Souviron's opinion was based upon the examination of photographs showing abrasion patterns upon appellant's hand and the comparison of those patterns with models of the victim's teeth. Using this comparison technique, the doctor was able to determine whether the wounds probably had been, could have been, or definitely had been made by the victim's teeth. He testified to a reasonable degree of dental certainty or probability that the two abrasion patterns on the index finger of the appellant had been made by the victim's upper right cuspid and the distal edge of the victim's right lateral incisor.
The dissent asserts that "Dr. Souviron's testimony is not inconsistent with innocence insofar as it is not a reasonably certain bite mark" and that "further inquiry was required to establish that diagnosis of abrasions is within bite mark analysis." We note, however, that the marks on appellant's hands were not thin scrapes or scratches, but were wounds in the form of "abrasion patterns." The wounds were shaped sufficiently similar to teeth for the trial court to find the comparison techniques reliable enough to submit to the jury. The trial court has wide discretion concerning the admissibility of evidence, and in the absence of an abuse of discretion, its ruling regarding admissibility will not be disturbed. Jent v. State, 408 So.2d 1024 (Fla. 1982).
The supreme court acknowledged in Bundy that the technique of bite-mark analysis does not result in identifications of absolute certainty, such as provided by fingerprint evidence. The probative value of Dr. Souviron's testimony was for the trier of fact to determine. Bundy.
The jury saw the actual photographs of appellant's hand, the model of the victim's teeth, and the teeth models of four patients introduced by the appellant. They had the opportunity to hold the teeth models against the photographs and to judge for themselves whether each wound was merely a scrape, or whether it was an abrasion pattern that could have been made by the appellant's teeth or by teeth belonging to one of the orthodontist's patients. Thus, the jury had the actual evidence used by the experts in formulating their opinions. They were then able to compare those opinions with their own observations of the photographs and models. It was within the jury's province to accept Dr. Souviron's opinion and to reject the opinions rendered by appellant's orthodontist and dermatologist. See Jent.
Appellant's second argument is that the trial court erred in denying his motion for judgment of acquittal. We find there was substantial, competent evidence to support the jury's verdict.
We are not allowed to retry a case or reweigh the conflicting evidence submitted to the jury. We must limit our concern to whether, after all conflicts in the evidence and all reasonable inferences derived therefrom have been resolved in favor of the verdict, there is substantial, competent evidence to support the verdict and judgment. Tibbs v. State, 397 So.2d 1120 (Fla. 1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).
Resolving all conflicts in favor of the verdicts, we find the record is sufficient to uphold the verdicts and judgments entered herein. The state presented evidence that the appellant had been in the apartment at or about the time the crimes had been committed, that the victim's boyfriend had not been at the apartment during that period of time, and that the boyfriend had not committed the crimes. The state also presented scientific evidence that appellant had broken the victim's jaw and that his shirt had not been torn in a scuffle. This evidence, together with the other circumstantial evidence presented to the jury, supported *931 the verdicts and judgments entered herein.
We realize that where the only proof of guilt is circumstantial, a conviction may not be sustained no matter how strongly the evidence may suggest guilt, unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972, 976 n. 12 (Fla. 1977); Mayo v. State, 71 So.2d 899 (Fla. 1954). The accepted standard on review, however, is not whether the evidence failed to exclude every reasonable hypothesis but that of guilt, but whether there was substantial, competent evidence for a jury to so conclude. Rose v. State, 425 So.2d 521 (Fla. 1983); see also, Tsavaris v. State, 414 So.2d 1087 (Fla. 2d DCA 1982). We also realize that in applying this standard, the version of events related by the defense must be believed if circumstances do not show that version to be false. McArthur at 976 n. 12; Mayo. Where there is other evidence legally sufficient to contradict his explanation, a defendant's version of a homicide may be ignored by the jury. See Williams v. State, 437 So.2d 133 (Fla. 1983).
Defense counsel suggested that the evidence showed appellant had been forced out of the apartment and that someone else could have murdered the victim. The jury could properly have found otherwise. See Williams. The jury could have concluded that had the appellant been forcibly removed from the apartment during the course of a struggle in which a table and chairs were overturned, the commotion would have woken up the victim's roommate and guests. They also could have concluded that none of the victim's blood was found on appellant's clothes because he took them off before entering the victim's bedroom. Given the expert testimony that at least two of the damaged areas of appellant's shirt had been cut and not torn, the testimony of Mrs. Newman that her husband, the victim's boyfriend, had not left their home, and expert testimony that the victim's teeth made the marks on appellant's hands, the jury could have found that appellant lied about his struggle with the three men.
We therefore conclude there was sufficient evidence presented to the jury from which they could properly determine that the hypothesis of innocence advanced by the appellant, i.e., that Brenda Clark was killed by someone other than appellant, was not reasonable. See Ferguson v. State, 417 So.2d 631 (Fla. 1983); Newberry v. State, 442 So.2d 334 (Fla. 5th DCA 1983). While it was in the province of the jury to believe appellant's version of the events, we cannot hold that the jury was precluded as a matter of law from finding appellant guilty of first-degree murder and arson.
Accordingly, we hold that the bite-mark testimony was properly admitted and that substantial, competent evidence exists in the record to support the verdict and judgment of the trial court.
AFFIRMED.
GRIMES, A.C.J., concurs.
CAMPBELL, J., dissents with opinion.
CAMPBELL, Judge, dissenting.
Because I conclude that the nature of the evidence relied on to support the conviction in this case is solely circumstantial, I find it necessary to repeat most of the salient facts in the record, which are also set forth in the majority opinion, to demonstrate that the evidence is not inconsistent with any reasonable hypothesis of innocence. I also conclude that many of the facts, as stated by the majority, take on additional nuances when coupled with other facts not included or stressed within the majority opinion. I, therefore, request indulgence by the readers of this case in the length of this dissent caused by a repetition of so much of the facts. In my opinion, it is necessary to an understanding of my dissent that the critical facts be viewed in sequence and in their entirety.
The victim, Brenda Clark, was an unmarried, twenty-six-year-old singer and waitress. On the morning of April 27, 1982, *932 she was beaten, strangled to death, then burned in her bed.
Appellant was charged with the crime approximately three days later. Only the events of April 26, 1982, which was the day appellant met the victim, and the events of the morning of the crime, are presented here.
On Sunday morning, April 26, 1982, appellant was visiting his neighbors, Al and Kim Vandermeulen, in Bonita Springs. He had recently been introduced to a friend of theirs, Sandra Grein. Sandra Grein invited appellant and the Vandermeulens to a party at her apartment on Marco Island that afternoon. Sandra Grein shared that apartment with the victim under an unclear financial arrangement between themselves and an old boyfriend of the victim, Al Douglas.
The party began around noon when appellant, Sandra Grein, and Al Vandermeulen reached the apartment on Marco Island. They had a few drinks and used some cocaine. The cocaine had been purchased by appellant.
The evidence is conflicting as to whether the victim was in the apartment when they arrived. It is clear, however, that sometime early in the afternoon, Ray Newman came to the apartment and spoke with the victim.
Ray Newman was the victim's boyfriend. He is a retired New York State policeman, who lived about five minutes from the victim's apartment. He is in his mid-fifties and married to Marsha Newman. He had been having an affair with the victim for approximately two months when the murder occurred. He had a reputation of being jealous of the victim.
At the party, Ray Newman had a private conversation with the victim. When appellant prepared to use some cocaine, Ray Newman left in a mood which was variously described as "upset," "angry," and "disgusted." Later, he called the victim on the telephone. Sometime shortly thereafter, an argument arose between the victim and Sandra Grein. At about the same time, the victim told appellant and the other guests to leave. They did not leave, however, because Sandra Grein told them to stay. In doing so, she told the victim that inasmuch as she, Sandra, also paid rent, she had the right to say who would stay at the apartment.
By 6 p.m., Kim Vandermeulen and her son, and Lynn Morris and her son, had also arrived at the party. The six adults drank, talked and played a card game called "Euchre." There is no evidence that anything more than casual conversation occurred between appellant and the victim. Appellant had not known the victim before meeting her that afternoon at her apartment.
Around 11:30 p.m., the Vandermeulens left the party. According to Sandra Grein's testimony, the victim then sang a few songs, played cards for a while, and went to bed around midnight. Lynn Morris, who also spent the night at the apartment, testified, however, that the victim went to bed around 1:30 a.m. Lynn Morris testified that she went to bed in Sandra Grein's bedroom, where her young son was already asleep, at approximately 1:45 a.m., which she said was about fifteen minutes after the victim went to bed. Sandra Grein, however, testified that Lynn Morris went to bed between 12:30 a.m. and 1:00 a.m.[1] Because they had been drinking all day, and because he was to move a waterbed for her the next morning, Sandra Grein told appellant that he was welcome to spend the night. One reason for appellant going to the apartment in the first *933 place was for him to move the waterbed in his truck. (The bed had not been moved by the time the party ended and everyone was ready for bed.) Sandra Grein made up the fold-out couch in the living room for appellant. She testified that he asked her to sleep with him, but she refused and went to bed in her own bedroom. Appellant lay on the couch and watched television before he fell asleep.
Sandra Grein testified that she woke up around 3 a.m. because the apartment was full of smoke. She got up, and as she left her bedroom, she found the apartment in disarray. She had to move an overturned table and chairs in the dining area of the living/dining room before she could get in the room. Appellant was not in the apartment. She saw that the smoke was coming from the victim's bedroom. She went back into her bedroom to awaken Lynn Morris and her son and get them out to the balcony. She looked into the victim's bedroom and saw that the bed was on fire. She threw a pail of water on the bed and called the fire department around 3:45 a.m.
When the firemen arrived, they found the victim lying on the bed with a scarf around her neck. The bed was the point of origin of the fire. According to the pathologist's testimony, the victim died of strangulation from the scarf around her neck before she was burned and after her lower jaw had been broken in two places by blunt trauma. No witness attempts to establish the time of death. Neither Sandra nor Lynn had heard anything before being awakened by smoke from the fire.
The scarf which was used to kill the victim was usually tied on a mandolin which hung on the wall just outside the door to the victim's room. It had belonged to or been given to her by a former boyfriend who had died unexpectedly a few months before. The former boyfriend's death was not explained in the record.
Although appellant did not testify at trial, tape recordings of the statements he gave to the police shortly after the crime occurred were played for the jury. In those statements, appellant said that he was asleep on the couch when he was awakened by three men. A large man grabbed him and struck him twice in the side and moved him toward the door, telling him to leave. Appellant struck the man once in the mouth with his right hand. The second man pointed a gun at appellant's face and motioned for him to leave. Appellant, still wearing his blue jeans and T-shirt from the day and evening before, picked up his shoes by the door and left. He said that his shirt was torn in the scuffle. Appellant recognized the third man as the victim's boyfriend, Ray Newman, whom he had only seen one time before when Newman visited the victim the previous afternoon. Appellant drove directly to Bonita Springs and woke up his neighbor, Al Vandermeulen, and told him that three men had driven him from the girls' apartment at gunpoint. Appellant tried to persuade Al Vandermeulen to drive back with him to the apartment to see if the girls were all right. Al Vandermeulen persuaded appellant not to do so, but he did telephone the apartment. The firefighters' records indicate that a phone call from an unidentified male was received at approximately 4:20 a.m. It is important to note that while the implication may be made, the fact is that in appellant's taped statement he never accused Ray Newman and the other two men of the murder of Brenda Clark.
Al Vandermeulen testified that appellant knocked on his window around 4 a.m. Appellant's wife, asleep in the adjoining duplex, also woke up when appellant was talking to Al. She looked at the digital clock by her bed and testified she observed the time as 3:05 a.m. She commented that she had just set the clocks to reflect the time change because of daylight savings time. When appellant came into the house, she noticed that his mouth was bleeding.
Al Vandermeulen testified that it was about a fifty-minute drive from the victim's apartment on Marco Island to their duplex in Bonita Springs. He stated that appellant told him he had just been beaten up by three guys who grabbed him by the hair *934 and pulled him off the couch, put a gun to his head, and told him to get out of the apartment. He verified that appellant wanted to go back to see if the victim and Sandra Grein were safe. Al also said he called the apartment after 4 a.m., but hung up shortly after a man, who later turned out to be a fireman, answered the telephone.
Ray Newman also testified at trial. He testified that he saw the victim around noon at her apartment on April 26, 1982, and that two men he did not know (Vandermeulen and appellant) were present. He left the party when one of the men prepared to use some cocaine. He saw the victim again around 4 p.m. in a parking lot on Marco Island where they spoke briefly. He denied being jealous of the victim. He went home around 6 p.m. and watched television with his wife until 11 p.m., when she went to bed. He testified he watched the news and a taped tennis match in which John McEnroe played. He said he turned the television off at 12:45 a.m., before the match was finished.
Marsha Newman, Ray Newman's wife, corroborated his story. She testified that she did not awaken after she went to sleep and could not testify at what time her husband went to bed, but she did not believe he could have left the house without her knowledge because the dog would have barked and awakened her.
The deposition of a representative of ESPN, Entertainment and Sports Programming Network, was admitted into evidence. He said that a McEnroe/Lendl tennis match on April 26, 1982, was a live broadcast from 9 p.m. until 12:23 a.m. There was a re-broadcast of the match later that same night, from 3:38 a.m. until 6:48 a.m., on April 27, 1982.
There was no physical evidence discovered in the victim's bedroom linking appellant with the crime. One hair found under the body was similar to the head hair of Ray Newman. There was blood splattered on the walls. A blood-splatter expert testified that the splatters were caused from blows to the victim's head. There was no evidence of rape or sexual molestation, although there was evidence that the victim had engaged in sexual intercourse approximately twelve hours before her death.
The clothes appellant wore that night were also examined by three experts. The FBI serology expert testified that a type A human blood stain on his shirt was not the victim's blood because she was a type B. It could have been made by appellant's own blood since he was a type A. An FBI microanalyst concluded that damage to the shirt was caused by cuts, not tears. The testimony of a textile engineer presented by the defense, indicated that two of the damaged areas in question on the shirt were cut, but concluded that the other two damaged areas were torn. The experts disagreed as to whether or not the shirt could be torn by hand.
It is of note, because the state emphasizes discrepancies in various time sequences, that no witness establishes when the fire started. An arson expert testified that the fire burned forty-five minutes to an hour, but does not, nor does any other witness, put that forty-five minutes to an hour in any particular time frame.
Over defense objections, a forensic dentist, Dr. Souviron, testified for the prosecution. His testimony will be referred to as "bite mark" testimony at times, although he examined scrapes or scratches on appellant's hand, rather than an actual bite mark that leaves a clear impression of the configuration of the teeth where teeth have been embedded in flesh. I could not more strongly disagree with the majority's conclusion that the "wounds were shaped sufficiently similar to teeth ... to submit to the jury."
Dr. Souviron examined enlarged, life-size photographs of an injury on appellant's knuckle. Appellant had a "drag mark" scrape or scratch on the knuckle of his index finger of his right hand. He had another small mark over the knuckle of his second finger. The second mark was difficult to see without a magnifying glass. Dr. Souviron compared the enlarged photograph of appellant's injury with a mold of *935 the victim's teeth. He never examined appellant's hand. He made the comparisons with the enlarged photograph of appellant's hand in an outstretched position. He never used a photograph of appellant's hand in a fist. He concluded that the wounds on appellant's hand were made by teeth. He said that the upper right cuspid made the large drag pattern on the index knuckle, and that the second mark was made by the back edge of the lateral incisor. He emphasized the second mark as being important. He stated that the wounds were consistent with the victim's head being on a pillow when the blow which caused the teeth marks was inflicted. Dr. Souviron ultimately concluded that the victim's teeth, in a reflex action from the blows to her jaw, made the mark on appellant's hand. He could not, however, exclude, except by probabilities, the marks having been made by other men and women with similarly shaped teeth.
A dermatologist testified for the defense. She examined appellant's hand and testified that the second mark noted by Dr. Souviron was a freckle, not a scrape. Her testimony was not refuted, except by Dr. Souviron's opinion as derived from examining the photographs of appellant's hand.
The defense also presented the testimony of an orthodontist who testified that he could not even identify the mark on appellant's hand as a tooth mark, much less as having been made by the victim's teeth. He also testified that the victim's teeth had very common characteristics. Of sixty molds selected from the orthodontist's former patients, eighteen people could have made the marks, according to the orthodontist.
Based on the evidence described above, the jury found appellant guilty as charged. They did so after first announcing they were deadlocked and then receiving the standard deadlocked jury instruction. They deliberated a total of ten hours and fourteen minutes.
I can understand their reluctance. The state convinced them to convict based on an assumption that appellant got up from the couch in the living room where he was sleeping, slipped into the victim's bedroom, hit her at least twice while she was asleep, breaking her jaw in two places. From the questioning of the officers who took appellant's statement which was introduced in evidence, I gather it was their theory that appellant went into the victim's bedroom to make sexual advances that were rejected, thereby sending him into a rage that caused the beating, murder and arson. There is no evidence to support any sexual advances toward the victim by appellant. I note that before the party ended, the evidence shows that any advances made were directed toward Sandra Grein, not the victim. There is no evidence that the victim was sexually molested during the crime. The state's apparent theory of appellant's motivation, therefore, is not supported.[2]
While motive is not an essential element of homicide, it is of increased importance when the proof of a crime is circumstantial, as in this case. See Daniels v. State, 108 So.2d 755 (Fla. 1959). Here, rather than supporting the state's theory of motivation, the evidence disproves the theory.
Dr. Souviron and the state's blood splatter expert opined that the blows to the victim's head, which broke her jaw in two places, occurred when her head was resting on her pillow on her bed. The evidence was that these blows occurred prior to her death by strangulation with the scarf. The blood splatter expert testified the blows *936 that broke the victim's jaw and caused blood to splatter on the bed, curtains, bedside table and walls, occurred while her "head was in a  the pillow position or a sleeping position on the pillow where you would normally sleep." The state's evidence then shows not that appellant went in and made sexual advances which the victim rejected, but that whoever went in hit her while she was asleep on her pillow. As a matter of fact, the assistant state attorney, in his closing argument, twice makes that point. First, he argued:
Bruce Bradford, the State's position is, the State's evidence proves, that what happened was that Bruce Bradford slipped into that bedroom, beat her severely, broke her jaw, beat her, went out. He saw where the bandana was. It was outside of the girl's bedroom on a mandolin, pulled that down, went back in. You heard from Dr. Schmid how he tied it around her and twisted that like a tourniquet around the neck killing her and then he went out and got that bottle of booze we just talked about, poured it on the bed and lit it.
Later, he continued that same argument by telling the jury:
You heard from an expert in the field, and he told you that the marks on the victim's hand are consistent  excuse me, the marks on the defendant's hands are consistent with those made by the victim. Damaging evidence. There's only one way these teeth marks were made on his hand and that's when he slipped in that bedroom, when she was lying there, nude, hit her several times, you heard, on the pillow, which was supported by Dr. Souviron's testimony; through the blood splatter expert, Jack Gant, the position of the body; boom, boom, hit her two or three times, at least, then panicked. What's going to happen when everybody else finds out?
He goes out. This is where the premeditation comes in. He has plenty of time to think about it, think of his plan. He goes out, saw where the mandolin was outside the victim's bedroom, pulls that scarf off the mandolin, ties it around her neck and strangles her to death and sets the place on fire, turns the table over, leaving those other chairs there so those other girls wouldn't be able to testify that he was the last one there.
The first point addressed on appeal is appellant's claim that the evidence is insufficient. For purposes of analyzing the sufficiency of the evidence, I assume, at this point, that the testimony of Dr. Souviron was admissible.
The standard of review regarding circumstantial evidence is that "no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." McArthur v. State, 351 So.2d 972, 976 n. 12 (Fla. 1977).
The evidence indicates that appellant was in the apartment before the crime occurred and was absent from the apartment when the crime was discovered. The victim's blood was splattered across the bedroom where the crime occurred, yet none of the victim's blood was on the clothing appellant wore that night. There was no indication that appellant attempted to clean those clothes before turning them over to the police for examination. None of the hair found in the room where the crime occurred could have belonged to appellant. In short, none of this circumstantial evidence connects appellant with the crime. The evidence is entirely consistent with reasonable hypotheses of appellant's innocence. Suspicion is directed toward appellant mainly because of his absence from the scene at the time Sandra Grein awoke, and because of some variances in several witnesses' testimony regarding time sequences. Thus, none of this circumstantial evidence forms a sufficient basis upon which the conviction could be sustained.
The only remaining evidence is Dr. Souviron's testimony wherein he attempts to positively identify appellant as the murderer through a reasonable probability that the victim's tooth made the mark on appellant's hand. Reviewing this testimony as if *937 it were properly admitted evidence, it cannot support the conviction.
Where there is positive identification through fingerprint evidence, under the standard of review for circumstantial evidence, the state must show that the fingerprints could only have been placed at the scene during the commission of the crime. Jaramillo v. State, 417 So.2d 257 (Fla. 1982).
Here, not only did the state fail to show that the mark could not have been made at some other time in some other way, but even if the mark was made by a tooth, Dr. Souviron could not attempt to remove all doubt as to who made the mark on appellant's hand. Dr. Souviron testified that his opinion was that the victim's incisor teeth made the marks on appellant's hand "to a reasonable degree of dental probability." On cross-examination, Dr. Souviron was read a portion of his deposition. He acknowledged that the statements made in the deposition were correct. He was asked, "It could have been (the victim's teeth which made the marks) but you're not saying that it certainly was?" He answered, "I'm saying that it could have been to a high degree of probability." These statements were presented again on recross examination and approved a second time by Dr. Souviron. On redirect, Dr. Souviron said, "I believe I stated that the marks were consistent to a reasonable degree of dental certainty." The next question was, "Of dental certainty or probability?" Dr. Souviron answered, "Well, either word, obviously  well, both of you are trying to get at, I think, the fact that this is not a reasonably certain bite mark. I am not positive to the exclusion of everyone in the world that ... the victim's teeth made the marks."
Thus, even if the jury chose to fully accept Dr. Souviron's testimony, that testimony did not positively establish appellant's guilt; there was only a probability according to Dr. Souviron.
In a criminal proceeding, the burden of proof is on the state to establish beyond and to the exclusion of every reasonable doubt, each element of the criminal offense charged. Rivers v. State, 140 Fla. 487, 192 So. 190 (1939); Bradshaw v. State, 353 So.2d 188 (Fla. 2d DCA 1977). Where the sole proof is based on a probability, as in the testimony of Dr. Souviron in this case, it appears that a reasonable doubt of appellant's guilt remains. "The law does not deal in probabilities, but in proof of guilt beyond a reasonable doubt." A.R. v. State, 393 So.2d 1174, 1175 (Fla. 3d DCA 1981). Evidence which provides a possibility of guilt does not provide proof beyond a reasonable doubt. Davis v. State, 90 So.2d 629 (Fla. 1956).
Evidence is legally insufficient if it does not prove the defendant's guilt beyond a reasonable doubt. Tibbs v. State, 397 So.2d 1120 (Fla. 1981), aff'd., 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The circumstantial evidence in this case, though it may be suspicious, is not inconsistent with innocence. Even Dr. Souviron's testimony is not inconsistent with innocence insofar as it is not a reasonably certain bite mark. Furthermore, the testimony of Dr. Souviron, such as it is, does not remove all reasonable doubt of appellant's guilt. That testimony, reduced to its probabilities, becomes merely another circumstance that, added to the other circumstantial evidence, is not sufficient to remove all hypotheses of innocence. The evidence in this case even conceding the admissibility of Dr. Souviron's testimony is, therefore, legally insufficient.
Finally, it is necessary to address the issue of the admissibility of the "bite mark" testimony and appellant's contention that Dr. Souviron's testimony should have been excluded from evidence.
I am aware of no other case where "scrape marks" have been used as in this case, as opposed to "bite marks" such as existed in Bundy v. State, 455 So.2d 330 (Fla. 1984). In Bundy, the use of bite mark evidence was approved. In evidence in that case, were indentations on the body of one of the victims that could "be clearly identified as human bite marks." Bundy at 258. The Florida Supreme Court held *938 that the trial court properly found that "the science of odontology, which is based on the discovery that characteristics of human dentition are highly unique, is generally recognized by scientists in the relevant fields and herefore is an acceptable foundation for the admissibility of expert opinions into evidence." Bundy at 264.
Dentition is "[t]he character of the teeth collectively as determined by their form and arrangement." Websters New International Dictionary 700 (2d ed. 1957). Here, there is not an identifiable human bite mark showing the configuration of the teeth as in Bundy; there is merely a scrape or "an abrasion," according to Dr. Souviron. He also states that this [scrape] "is not a reasonably certain bite mark."
While a proper predicate was clearly established to show that Dr. Souviron is an expert in the field of odontology, or bite mark analysis, further inquiry was required to establish that diagnosis of abrasions is within the ambit of bite mark analysis. See, e.g., Fay v. Mincey, 454 So.2d 587 (Fla. 2d DCA 1984). Before the opinion testimony of an expert may be admitted into evidence, and that evidence and its deficiencies weighed by the jury, the court must determine that the witness is an expert for the purpose for which he is testifying. Here, there was no predicate showing that Dr. Souviron was an expert for the purpose of analyzing the scrape on appellant's hand and, therefore, his testimony was improperly admitted.
In addition, it is necessary to discuss the problems inherent in testimony which seeks to provide positive identification evidence in terms of reasonable probability.
Generally, the opinion of medical experts regarding the cause of an injury or death need only be in terms of reasonable medical certainty to be admissible. Holland v. State, 359 So.2d 28 (Fla. 3d DCA 1978), cert. denied, 367 So.2d 1124 (Fla. 1979). See also, e.g., Vaillancourt v. State, 288 So.2d 216 (Fla. 1974). Here, however, the medical or dental testimony is offered primarily to provide positive identification of an individual. It is not clear that the same standard of medical probability should be used to allow identification testimony into evidence.
Other types of evidence connecting a defendant to a crime in terms of reasonable probability are clearly admissible. For example, in Jent v. State, 408 So.2d 1024, 1029 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982), hair analysis evidence was admitted although it was presented in terms of probability. There, the technician could not positively identify the hair as being the defendant's, but it was "highly likely" that one of the hairs found at the scene of the crime belonged to the defendant. However, the testimony presented in Jent and the testimony in this case, is distinguishable. In Jent, the technician was, without a doubt, examining a piece or strand of human hair. From that examination, the technician established the probability that one of the hairs was the defendant's. Here, Dr. Souviron alone determined that the mark on appellant's hand is a reasonably certain human tooth mark. Based on that probability, he determines that there is a reasonable probability that the victim's tooth caused the mark. This type of stacking of probabilities is highly unreliable, especially considering the complete absence of testimony that it is a scientifically acceptable procedure to identify a person by way of a scrape mark of this nature. This testimony of "positive" identification through probabilities, provided by an expert with the qualifications of Dr. Souviron, was extremely prejudicial. Accordingly, due to its lack of reliability and its extremely prejudicial effect, the testimony of Dr. Souviron should have been excluded.
Because the evidence is insufficient, even if the admission of Dr. Souviron's testimony is conceded, I would reverse the trial court's denial of appellant's motion for judgment of acquittal, remand for entry of such a judgment and direct that appellant be discharged.
NOTES
[1] This is pointed out merely to illustrate that all of the witnesses who testified as to time sequences in this case invariably, and seemingly without exception, have considerable discrepancies in what they believe is the time a certain event occurred. Since, as it later appears, the appellant's inability to accurately relate times and events focuses suspicion upon him, I therefore illustrate the other witnesses' problems with time elements to show that such discrepancies can arise out of complete innocence, as well as be indicative of suspicious conduct. Therefore, because appellant might be inaccurate in regard to the time of the occurrence of events, this may be overemphasized as a circumstance pointing to his guilt.
[2] The majority places emphasis on the fact that because of the discrepancies in appellant's testimony as it relates to other evidence, the jury could therefore conclude he was not telling the truth about those matters in which he was inconsistent. My concern is that even though he may have been inconsistent and even perhaps untruthful, that alone is not evidence he committed this brutal murder for which no evidence of any motive whatsoever exists. While evidence of motive for a homicide is not necessary, where the evidence is not strong enough to establish beyond all doubt that the accused is the guilty person, and where proof of the crime is circumstantial, "motive may become both important and potential." Daniels v. State, 108 So.2d 755 (Fla. 1959).