587 So.2d 1366 (1991)
Kenneth D. RAGER, Appellant,
v.
STATE of Florida, Appellee.
No. 89-02496.
District Court of Appeal of Florida, Second District.
September 27, 1991.
Rehearing Denied November 4, 1991.
*1367 Samuel R. Mandelbaum of Smith & Williams, P.A., Tampa, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee and Carol M. Dittmar, Asst. Atty. Gen., Tampa, for appellee.
RYDER, Acting Chief Judge.
Kenneth D. Rager appeals his convictions of one count of racketeering, twenty-seven counts of securities fraud and twenty-seven counts of grand theft. We conclude that the trial court erred in not granting appellant's motion for judgment of acquittal. Insufficient evidence was adduced as to Rager's involvement and knowledge of the illegal acts. We accordingly reverse the trial court's order denying appellant's motion for judgment of acquittal on all counts and direct the trial court to order him discharged.
Rager, Lloyd H. Lawrence, Lawrence, Rager and Company, Inc. and Lawrence Properties Group were charged with racketeering, securities fraud and grand theft in connection with events which took place between October 1, 1985 and April 30, 1986 concerning two limited partnerships, Centrim Fund I and Centrim of Leesburg. The illegal actions specifically involved a commingling of funds in a "sweep account," and the Buker loan transaction which resulted in the premature breaking of an escrow account.
Lawrence had been involved since the late 1970's in the sale of securities for the purpose of developing commercial projects when Rager was hired as a salesman in 1982. In 1984, Lawrence Properties Group was formed with Lawrence as its 95% owner and president, and Rager acquired a 50% interest and became president of Lawrence, Rager and Company. At no time did Rager ever have any ownership interest in Lawrence Properties Group or any other related companies which remained exclusively in Lawrence's control. By 1985-86, Lawrence Properties Group had formed twenty-five limited partnerships for the purpose of developing twenty-six to twenty-eight office and commercial building projects. A multitude of partnerships had successfully been sold, fully syndicated and closed out by Lawrence, Rager and Company prior to 1986. Due to his disability from alcoholism and other personal problems, Lawrence informally declared Rager president of Lawrence Properties Group in January 1986. However, Lawrence alone continued to sign major promissory notes and other critical documents on behalf of Lawrence Properties Group and its limited partnerships. Rager was never made signatory to bank accounts and had no authority to obtain release of bank records. Lawrence, the comptroller and bookkeeper, maintained exclusive control over all bank accounts.
Lawrence hired Phil Wall as comptroller although he had no experience or degree in accounting and was not a CPA. Wall personally engineered the sweep account whereby escrow funds from over twenty separate limited partnership escrow accounts were commingled with the Lawrence Properties Group account and "swept" into a single common operating account. Bookkeeper Vivian Cooney handled the accounting of the various escrow accounts for Lawrence Properties Group and was signatory to all its bank accounts as well as those of the related companies and the various limited partnerships. Cooney answered only to Lawrence, and never acted pursuant to Rager's direction.
During the fall of 1985, some cash flow problems developed with respect to a few other limited partnerships. Lawrence Property Group's attorney attributed it to two anchor tenants' sudden default on their leases, problems wholly unrelated to the management of Lawrence Property Group. He was unaware of any serious problems with the other commercial developments *1368 and limited partnerships. Rager had no involvement or knowledge of these problems.
Rager received his financial status information from Lawrence and had no direct contact with Phil Wall. Although Rager was advised in late August 1985 that the projected fall distributions to investors in six other limited partnerships would decrease, this problem did not concern Centrim Fund One or Centrim of Leesburg. When Rager questioned this, Wall sent him a handwritten memorandum dated September 1, 1985, in which he cited several problems with the other partnerships.
Rager then discussed the memo with Lawrence who responded that he had little faith in Wall's credibility. On September 23, 1985, Lawrence sent Rager a letter noting several changes in policies, which should lead to dividends on limited partnership income exceeding their projections. No one realized in January 1986 the financial problems because everyone accepted Lawrence's facade until April 1986. Wall's employment was terminated in February 1986 because his financial information was universally considered inaccurate.
The Centrim Fund I offering memorandum provided that the general partners owned 20% of the project. Lawrence directly or indirectly owned 99% of the general partner's share; Rager owned 1%. The subscription proceeds would be held in an escrow account until cash subscription proceeds from the sale of fourteen limited partnership units had been received. In the event of inadequate subscriptions, all proceeds and interest earned would be returned to each of the subscribers. A general partner or affiliate was specifically authorized to acquire a limited partnership interest.
Only seven units had been sold by November 11, 1985, and due to a property closing deadline, Lawrence advised Rager that an additional $75,000.00 was needed for a short period of time for its purchase. Rager contacted an acquaintance, David Buker, for a short-term loan or investment of $75,000.00 to purchase this property. After the purchase, and Centrim Fund One's syndication, Buker would be repaid. Buker had known Rager for four or five years, and had invested in a couple of properties in the past.
Buker and Lawrence conducted discussions alone, and outside Rager's presence on November 12, Buker gave Lawrence two checks totaling $78,000.00. Buker's checks were then deposited into the Centrim Fund I escrow account, together with a Lawrence Properties Group check in the amount of $58,500.00 signed by Phil Wall. Lawrence purchased an additional seven units, and the escrow account was broken and disbursed on November 12, 1985. The same date, Lawrence furnished three checks to Buker signed by Lawrence totaling $79,000.00. The next day, the account balance was transferred into Lawrence Property Group's sweep account.
Rager testified that he had no knowledge of any of these banking transactions. The first time he saw these checks was five months later in April 1986 when reviewing them with the investigators from the Division of Securities and the National Association of Securities Dealers.
Phyllis Perri, administrative assistant for Lawrence, Rager and Company, recorded investor checks and forwarded them to Vivian Cooney. She relied on Cooney to correctly deposit the checks, and never knew of any problems with investment checks. Several Centrim of Leesburg investor checks were never deposited by Cooney into the escrow account for Leesburg, but instead were deposited directly into the Centrim Fund I escrow account. Rager had no knowledge of Cooney's mishandling of subscription checks. Later in March or April 1986, after learning of the situation, Rager promptly stopped the Leesburg limited partnership program. Additional Leesburg subscription checks were returned by Rager, who advised that this program was no longer being offered.
When Rager tried to get a financial overview in 1986, he came across conflicting *1369 financial information. Initially, Lawrence told Rager that the cash flow was sufficient for the first few months of 1986, but there were severe financial problems. Wall's financial statements showed the cash position of the various partnerships as of December 31, 1985 as having more than $405,000.00 in the bank, but the balance of the sweep account was actually zero. Rager also learned in 1986 that Cooney had never reconciled any of the monthly bank statements for late 1985. Therefore, Rager deemed it necessary to hire a qualified person for an audit. Wall's financial records were so extremely lengthy that Rager had relied on Wall's representations and his financial statements.
Rager, with the assistance of Coopers and Lybrand, hired an additional bookkeeper in February 1986, and, over Lawrence's objection, a certified public accountant. Rager cut payroll and employees and borrowed $15,000.00 from his wife to make the payroll.
Rager and the corporation's attorney met several times in late March and early April 1986 concerning problems uncovered by the certified public accountant. This led to Rager's telephone communication on April 9, 1986 with the Florida Division of Securities concerning the commingling and misappropriation of funds. Rager also advised the National Association of Securities Dealers and all the limited partners of the situation. According to state securities investigator Farrar, Rager was cooperative with the division's investigation and he did not stonewall them in any way. The investigators unsuccessfully attempted to contact Lawrence, but never spoke to him.
Appellant raises seven points on appeal. Because the first issue concerning sufficiency of evidence is dispositive, we do not address the remaining issues. A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. Jaramillo v. State, 417 So.2d 257 (Fla. 1982). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972, 976 n. 12 (Fla. 1977); Bradford v. State, 460 So.2d 926 (Fla. 2d DCA 1984), review denied, 467 So.2d 999 (Fla. 1985). It is not enough that the facts may create a strong probability of guilt. Owen v. State, 432 So.2d 579 (Fla. 2d DCA 1983). The accepted standard on review, however, is not whether the evidence failed to exclude every reasonable hypothesis but that of guilt, but whether there was substantial, competent evidence for a jury to so conclude. Rose v. State, 425 So.2d 521 (Fla. 1982), cert. denied, 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983); Bradford. In applying this standard, the version of events related by the defendant must be believed if circumstances do not show that version to be false. McArthur at 976 n. 12; Bradford.
We conclude after an extensive review of the record that the evidence was insufficient upon which the jury could have reached a guilty verdict. This case presents nothing but circumstantial evidence which is minimal at best. Appellant's hypothesis of innocence is that Lawrence, Cooney and Wall held exclusive control over the financial reins of the companies, and any culpable acts were directed by them. The record overwhelmingly shows that all actions were directed by Lawrence. The testimony concerning the commingling of accounts reveals that the sweep account was created by Wall, and Cooney independently or pursuant to Lawrence's direction misdeposited investor checks. When Rager received Wall's September 1985 memorandum, Lawrence minimized its significance and questioned Wall's credibility and competence. Despite his office, Rager lacked access to any accounting or bank records. Although the appellee makes much of Rager's informal status as president, the testimony nonetheless shows that Lawrence continued to "call the shots."
*1370 As to the Buker transaction, Buker's testimony supports Rager's hypothesis. Following a brief introduction, all details of this transaction were handled by Lawrence. Rager did not know of the Lawrence Property Group repayment checks until April 1986. The established relationship between Rager and Buker is not inconsistent with appellant's hypothesis of innocence.
Although appellee has arguably shown grand theft and securities fraud occurred here, the state failed to show mens rea to tie Rager to the criminal acts. There is but a paltry amount of evidence to show criminal conduct. Intent may be shown by circumstantial evidence, but if proof rests solely on circumstantial evidence, the proof must be not only consistent with the guilt of the accused, but also inconsistent with any other reasonable hypothesis of innocence. Ross v. State, 474 So.2d 1170 (Fla. 1985); Shaw v. State, 510 So.2d 349 (Fla. 2d DCA 1987). The state must prove that Rager aided and abetted Lawrence in the commission of the crime and had the specific intent to participate in the crime. Valdez v. State, 504 So.2d 9 (Fla. 2d DCA 1986). The evidence showed that Rager had limited sales contact with the investors, and that although he and other salespersons touted the safety of the escrow feature, he had no knowledge until late March or April 1986 that the checks were being commingled in the sweep account. Instead, Rager tried his best to pull the situation out by hiring an independent auditor and using personal funds to make payroll.
It is impossible for us to allow on the evidence shown here a verdict of guilty. Rager was swept up in the emotions of Lawrence's criminal conduct as the only remaining individual to prosecute.
Reversed with instructions to discharge appellant.
FRANK and PARKER, JJ., concur.