DAUKSCH, Judge.
This is an appeal from a judgment and sentence for grand theft.
The question on appeal is the sufficiency of the evidence.
William Holloway, the owner of two Texaco Food Marts, testified at trial that there were six employees working in his Homosas-sa store between December of 1993 and January of 1994. Generally, there are two shifts a day and two employees on each shift. The first shift is from 6:00 a.m. through 2:00 or 3:00 p.m. and the second shift is from the end of the first shift through 11:00 p.m. The store has two cash registers, one of which is in front and the other in back.
Holloway testified that groceries, non-taxable and taxable items and sales tax are calculated on a Z tape in the register and that gas and Lotto sales are calculated separately. Although an accounting is done once a day, the Z tape, gas console and Lotto machine are read at the end of each shift or twice a day. The clerk on duty is responsible for this and for writing the figures on an activity report at the end of his shift. The report is then compared with the actual cash in the cash drawer. The activity reports are posted to a daily accounting sheet the next morning.
The net sales figure in the register is calculated by reading the Z tape after which the tape automatically begins with a zero balance. Every shift therefore begins with a zero balance on the Z tape. The purpose of this is to simplify the employees’ paperwork. There is also a Z counter at the bottom of the tape which counts the Z readings. Additionally, there is a G.T. or grand total of all sales at the top of the tape and a G.S. or grand sum which is the amount collected since the last Z tape was read. The time is printed on the tape each time a Z reading is done. An X reading shows the total amount of sales per day without resetting the grand sum to zero as in the case of a Z reading. Each register has a dated receipt tape from which the customers’ receipts and the Z readings are generated and a journal tape which stays in the register until it runs out. The latter tape is a permanent record of all transactions. When this tape runs out, it is removed and taken to the office.
Holloway testified that on January 8,1994, he noticed that his gas readings were off. Specifically, the figures in the January 7th activity reports did not jibe with those from the gas console. According to Holloway, there was a $600 difference between the gas console total sales figure of $1,805.03 and the two daily activity report figures of $1,260.87. Additionally, the unleaded fuel had run out even though the inventory sheets showed there was still some remaining. Holloway had never experienced such a major discrepancy in his paperwork. He was also alarmed because the first shift had sold approximately $1,000 worth of gas whereas the second shift had sold only $200 worth. After recalculating the figures, Holloway looked at the gas figures in the register. Those figures were close to the gas console figures.
Recalling that he had helped Rachel Hunt, the first-shift clerk, reconcile her shift the day before, Holloway looked for her gas console figures but they were gone. Checking the figures from the register, he found no discrepancy between the G.T. and G.S. from her shift. As to the p.m. shift, however, there was a $1,100 difference between the G.T. and the G.S. After checking the Z readings, Holloway found that a Z reading had been done at 3:30 p.m. and again at 9:52 p.m. Because the Z counter numbers ran in the order of 752 and 754, however, he surmised that another Z reading had been done between the two. Thus, the final figure for the p.m. shift showed only those sales which had been made since the missing Z reading rather than the total sales for the shift. Subtracting the 752 G.T. from the 754 G.T., Holloway testified that he should have arrived at a figure of $2,273.98. The G.S., however, showed a figure of $1,176.13 leaving an unaccounted for difference of $1,097.85.
Holloway recalled that his son, Chris, and appellant had worked on the p.m. shift that day. He admitted, however, that Rachel Hunt had also worked in the store until 5:30 *1101 p.m. Although he thought she might have been stocking the store or working in the cooler, he did not think she could have run the register because he was with her most of the time. He later acknowledged that it could have happened. Holloway verified the work calendar by comparing it with the time cards and the activity reports for the day in question. He later admitted that the clerks had not always signed their activity reports because they were not required to. Although schedule changes were reflected on the time cards, the cards did not all have dates. The date and time could also be changed on the register tape. Because of daylight savings time, Holloway admitted that the time on the machine could be off by an hour. He testified that he had not verified the time on the register tape because he had never had a reason to question it.
Holloway also found a discrepancy in excess of $8,000 between the G.T. and the G.S. between December 9, 1993 and January 7, 1994. On each of the days in question, a portion of or the entire register tape for certain shifts were missing. There was no testimony, however, as to who had worked during those shifts. Based upon the unrecorded sales, Holloway concluded that cash had been removed from the register. He admitted that he was unsure whether the register was “short or over” for each of the days in question. He testified, “The figures were not there. The sales were missing. They were gone.” He later testified that “because we didn’t come out over,” ... “it [the money] went somewhere.” He surmised that “someone rang it up, took the money out, Z’d it and started over again” in the middle of his shift.
Holloway testified that the store had a video camera which was there for the employees’ protection. Although he did not save all of the videotapes which he had recorded, he did save the January 7th videotape in which he noticed several unusual things. First, he observed appellant run a reading on the gas console while Chris was in the cooler. Second, she moved the key in the register and hit the amount tender button after Chris left the store to buy dinner. Although the camera changed angles at that point, Holloway testified that he could hear a register reading being run which lasted between forty and forty-five seconds. He later admitted that he could not tell what type of a reading had been done. Third, the lid was off of the register at one point for no apparent reason. Appellant told Holloway she had pulled the lid out but he did not see a new journal tape indicating that she might have been changing the tape. Thus, he surmised that she had removed the lid to take part of the tape. When he asked her about the register reading and the fact that the gas console had been cleared, she denied that she had touched the register but admitted that she had cleared the gas console to see how much gas she had sold.
Holloway acknowledged that it was not uncommon to have “an over or short” of the total sales amount based upon credit cards, inventory, coupons, cash, house accounts and pay-outs. Despite this fact, however, he had always been able to determine the cause of any accounting discrepancy. Although he denied having ever taken any cash from the register for his own personal use, he admitted that he had sometimes credited credit card sales from one business against the gas at his other business. When he was asked whether this was a common practice, he replied, “I don’t see why not. It’s money tied up.” He emphasized that he had always documented the transactions in the books of both businesses. He testified, “I show it on paper — That one station didn’t buy it, that it loaned the other station that.” He explained that the books “go collectively into the master company.” Occasionally, he had also transferred merchandise from one store to the other. He further admitted that he had been required to pay cash for his gas orders for one year after one of his cheeks was returned for insufficient funds. Holloway lost both of his gas stations after they went bankrupt.
Christopher Holloway testified that he worked on January 7th from approximately 4:00 p.m. until 11:00 p.m. He recalled having stocked the walk-in cooler that day from the back of the store during which time he was unable to hear what was going on inside the store because of the noise generated by fans. *1102 He further recalled having gone to Wendy’s that night to get dinner for appellant at her request. Although he had suggested that she get something from Luigi’s which was three or four minutes away, she had said she wanted something from Wendy’s which was about a half-an-hour or more away.
Officer Ken Perez confirmed William Holloway’s account of the videotape and further confirmed that portions of the journal tape and some of the Z readings were missing for the days in question. He testified that appellant did two readings on the videotape but that he could not tell what type they were. During the earlier reading, he saw her remove the cover from the journal tape. Appellant told Perez, when asked about the first reading on the videotape, that she had merely taken a subtotal by doing an X reading and that Chris had been with her at the time. She explained that the clerks were initially required to run an X and later an X and a Z reading at the end of their shifts but that recently only a Z reading had been required. Because business was so slow that evening, she and Chris “did a ten on the gas console” and “an X on the register.” Appellant also told Perez that it was common to be over or short all the time. Although there was generally a disparity of between $10 and $25, it was sometimes as much as $100. She acknowledged, however, that any accounting disparity showed up when Holloway did his paperwork. Appellant said that money was commonly missing and that Holloway was always accusing someone of stealing money because the business was unorganized. Finally, she said that there was no set routine as to which employee filled out the activity report at the end of the shift.
Appellant testified at trial that Rachel Hunt had worked and had done the paperwork for each of the shifts in which there was an alleged accounting deficiency. According to appellant, Hunt had even come in on her days off. Appellant also testified that Hunt had clocked her in on many occasions when she was late so she would not get in trouble. Occasionally, Hunt was already running the register when appellant began her shift. Other employees also had access to the register even if they were not clocked in. Appellant recalled that on January 7th, Hunt had clocked out at 5:30 p.m. but had not left the store until about 7:00 or 8:00 p.m. She further testified that she had run an X reading on the register during her shift that evening to tell Holloway how much money the store had made because Chris had wanted to leave early for a date. Additionally, she testified that she had removed the lid from the register because the tape had become unravelled which happened frequently. Appellant and several of Holloway’s former employees further testified that Holloway and his family members had occasionally removed cash from the register and that he had changed the figures on the bank deposit slips and the figures on their paperwork when they did not balance. They testified finally that he had commonly transferred money and inventory from one store to the other, that the stores had frequently run out of gas and that his gas payments had sometimes bounced.
We conclude as a matter of law that the evidence presented at trial by appellee fails to exclude every reasonable hypothesis of innocence. In State v. Law, 559 So.2d 187 (Fla.1989), the supreme court set forth the standard for reviewing circumstantial evidence eases as follows:
The law as it has been applied by this Court in reviewing circumstantial evidence cases is clear. A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. Jaramillo v. State, 417 So.2d 257 (Fla.[1982]). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972 (Fla.1977); Mayo v. State, 71 So.2d 899 (Fla.1954). The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse. Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 *1103 (1984); Rose v. State, 425 So.2d 521 (Fla.1982), cert. denied, 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983), disapproved cm other grounds, Williams v. State, 488 So.2d 62 (Fla.1986).
# # * * * *
... A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See Wilson v. State, 493 So.2d 1019, 1022 (Fla.1986). Consistent with the standard set forth in Lynch, if the state does not offer evidence which is inconsistent with the defendant’s hypothesis, “the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law.” 293 So.2d [44] at 45 (Fla.1974). The state’s evidence would be as a matter of law “insufficient to warrant a conviction.” Fla.R.Crim.P. 3.380.
It is the trial judge’s proper task to review the evidence to determine the presence or absence of competent proof from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. Spinkellink v. State, 313 So.2d 666, 670 (Fla.1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976). The state is not required to “rebut conclusively every possible variation” of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant’s theory of events. See Toole v. State, 472 So.2d 1174, 1176 (Fla.1985). Once that threshold burden is met, it becomes the jury’s duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt, [footnote omitted]
Law, 559 So.2d at 188-189.[1] See also Helm v. State, 651 So.2d 142, 143 (Fla. 2d DCA 1995); Hale v. State, 651 So.2d 97 (Fla. 2d DCA 1994); Helton v. State, 641 So.2d 146 (Fla. 3d DCA 1994), rev. den., 651 So.2d 1194 (Fla.1995); Lee v. State, 640 So.2d 126, 127 (Fla. 1st DCA 1994).
Viewing the evidence in a light most favorable to appellee, we conclude that it failed to present competent, substantial evidence which is inconsistent with every reasonable hypothesis of innocence. Although appellee is not required to conclusively rebut every variation of events which may be inferred from the evidence, it is required to present competent, substantial evidence which is inconsistent with appellant’s theory of events. See Naumowicz v. State, 562 So.2d 710 (Fla. 1st DCA 1990), rev. den., 576 So.2d 289 (Fla.1991). See also Helm; Rager v. State, 587 So.2d 1366 (Fla. 2d DCA 1991). It is not enough if the facts merely create a “strong probability of guilt.” See Owen v. State, 432 So.2d 579, 581 (Fla. 2d DCA 1983). See also Rager, 587 So.2d at 1369. The evidence must “on the whole” lead to a “moral certainty that the accused and no one else committed the offense charged.” Owen, 432 So.2d at 581 [relying upon Hall v. State, 90 Fla. 719, 107 So. 246 (1925)]. As Judge Hubbart noted in his dissent in Jones, criminal convictions based solely on circumstantial evidence should not be permitted to stand unless the state’s case has gone beyond a mere suspicion and unerringly points to the defendant’s guilt to the exclusion of every reasonable hypothesis of innocence. Jones, 466 So.2d at 324. The rationale for the standard is explained below:
The underlying justification for the circumstantial evidence standard, ... and its corresponding rigorous enforcement seems obvious enough. The finger of suspicion implicit in circumstantial evidence is a long one and may implicate both the innocent and guilty alike. Persons caught in a web of circumstances may often appear guilty upon first impression, but in fact be entirely innocent as surface appearances are frequently deceiving. A person ought not be convicted of a crime, it is thought, and his *1104 freedom taken from him based on such tenuous and ambiguous evidence. To avoid, then, convicting entirely innocent people based on suspicion and innuendo, the law has long demanded a high standard of proof when reviewing convictions based entirely on circumstantial evidence. Given our long-standing commitment to the ideal of individual freedom, this result seems both fair and reasonable. As has been often stated, “[o]ur responsibility in such circumstances — human liberty being involved — is doubly great,” Head v. State, 62 So.2d 41, 42 (Fla.1952), because “[t]he cloak of liberty and freedom is far too precious a garment to be trampled in the dust of mere inference compounded.” Harrison v. State, 104 So.2d 391, 395 (Fla. 1st DCA 1958).
Id. at 324-326.
In this case, appellant’s hypothesis of innocence is that William Holloway’s business was unorganized, both in its manner of operation and with regard to its internal bookkeeping procedures, and that there were other persons on the premises who could have committed the thefts on the occasions on which the money was allegedly stolen. With the exception of the alleged theft on January 7, 1994, there was no testimony that appellant had worked during any of the other shifts on which the remaining sums of money were allegedly stolen. As to the money allegedly missing on January 7th, the evidence showed that Rachel Hunt and Chris Holloway were also present during appellant’s shift. Although William Holloway did not think Hunt had worked on the register during appellant’s shift, he could not say so unequivocally. Moreover, there was no clear indication as to who had filled out the activity report for that particular shift. Holloway formulated his conclusion that money had been stolen on the occasions in question based upon missing Z tapes, as evidenced by the Z counter, and based upon discrepancies between the G.T. and the G.S. Significantly, however, he testified that he was unsure whether the discrepancies were the result of being short or over. He later testified that because he did not come out over, the money must have gone somewhere. Thus, the proof as to his actual loss of cash was tenuous at best.
Finally, intent is an essential element of the crime of theft. See § 812.014(1), Florida Statutes (1993). Proof of intent for this crime is often not shown directly but instead can only be inferred. See Jones v. State, 192 So.2d 285 (Fla. 3d DCA 1966). See also Coester v. State, 573 So.2d 391 (Fla. 4th DCA 1991). In this case, appellee’s proof of appellant’s intent to steal was solely based upon circumstantial evidence. Although it tried to prove her intent through Holloway’s videotape, the videotape merely creates a rebuttable inference of guilt. Appellant admitted that she had taken a gas console reading because Chris had wanted to leave early that evening and that she had told Holloway she had done so. Additionally, both Holloway and Officer Perez testified that they could not tell what type of a register reading was actually done. Thus, the reading could have been an X reading as appellant testified. Finally, appellant’s explanation that she had removed the register lid to fix the tape which had become unra-velled was unrebutted. Because the circumstantial evidence presented by appellee fails to exclude every reasonable hypothesis of innocence, appellant’s conviction for grand theft is reversed, her sentence vacated and she is discharged. See R.S. v. State, 639 So.2d 130 (Fla. 2d DCA 1994); M.W. v. State, 596 So.2d 534 (Fla. 5th DCA 1992); Rager, Coester.
JUDGMENT REVERSED; APPELLANT DISCHARGED.
W. SHARP and THOMPSON, JJ., concur.

. In Jones v. State, 466 So.2d 301, 318-326 (Fla. 3d DCA), rev. den., 478 So.2d 53 (Fla.1985), Judge Hubbart, in a dissenting opinion, provides an excellent discussion of the strict standard of proof to which the state must adhere in surviving a defense motion for judgment of acquittal in a case based upon circumstantial evidence.