937 So.2d 789 (2006)
Salah E. DARWISH, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-4643.
District Court of Appeal of Florida, Second District.
September 13, 2006.
*790 Ronald N. Toward, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and William I. Munsey, Jr., Assistant Attorney General, Tampa, for Appellee.
WALLACE, Judge.
Salah E. Darwish challenges his judgment and sentence for the third-degree felony of cheating, section 817.29, Florida Statutes (2004). Mr. Darwish was convicted of cheating by false pretenses after an investigation showed that he was selling bottled water that had been distributed gratuitously as relief supplies in the aftermath of Hurricane Charley. Because the State failed to prove that the distributor of the supplies relied on a misstatement of fact made by Mr. Darwish concerning his intended use of the bottled water, we reverse the judgment and sentence imposed on Mr. Darwish.

I. THE FACTS
On August 13, 2004, Hurricane Charley roared ashore at Charlotte Harbor in Charlotte County. The storm left a path of destruction in its wake as it crossed the state in a northeasterly direction over central Florida. Polk County suffered severe and widespread damage from the storm. The small community of Alturas, which is located south of State Road 60 between Bartow and Lake Wales, was especially hard hit. Many individuals and businesses in the area were without electrical power and water for several days.
Officials managing the relief effort made arrangements for bottled water and ice to be shipped from out of state directly to distribution centers in the areas where they were needed. The Alturas Fire Station was one of the centers designated for the distribution of these essential relief supplies. Firefighters and volunteers working at the station assisted in unloading the trucks and distributing the supplies.
The bottled water was distributed at no charge. Persons receiving the water were not required to fill out an application or to identify themselves. Two cases of water was a normal distribution in the first days of the relief effort. However, the relief workers would give additional cases on request to people who had special needs or who were taking water for distribution to others. In such instances, the relief workers might ask persons requesting additional cases to explain what they were doing with the water.
At the time of the storm, Mr. Darwish operated a convenience store in Alturas that was located around the corner from the fire station. The store was without electrical power and fresh water after the storm. On August 17, 2004, Belinda Tanneran Alturas residentvisited Mr. Darwish's store. Ms. Tanner had previously received several cases of bottled water at the fire station. On her visit to Mr. Darwish's store, Ms. Tanner noticed that he was selling the same kind of bottled water that was being distributed for free at the nearby fire station. Ms. Tanner linked the water that Mr. Darwish was selling to the relief supplies because it was *791 a distinctive brand that was not normally sold or distributed in Florida. Ms. Tanner bought a gallon bottle of water and a cup of ice from Mr. Darwish for $1.59. A legend on the bottle stated that the water had been bottled on August 15, 2004, two days after the storm. However, the bottle did not indicate that it was not intended for resale. Ms. Tanner saved the bottle and marked it so that she could identify it later as having been purchased from Mr. Darwish. After she left the store, Ms. Tanner contacted the authorities and complained about Mr. Darwish's sale of the water.
Mr. Ruben Gardner of the Florida Department of Agriculture and Consumer Services responded to Ms. Tanner's complaint. After speaking with Ms. Tanner, Mr. Gardner visited Mr. Darwish's store. Mr. Gardner observed and photographed the same brands of bottled water in the store's cooler that had been distributed at the nearby fire station as part of the relief effort. Mr. Gardner saw additional cases of the water from the relief effort stored on the floor in the back of the store. Mr. Darwish initially denied that he had obtained the water from the fire station. After Mr. Gardner questioned him further, Mr. Darwish admitted that the bottled water in the store came from the relief supplies. Mr. Darwish offered to make amends by writing a check as a donation to the fire department. Mr. Gardner arranged for some of the water to be returned to the fire station.

II. THE PROCEEDINGS IN THE CIRCUIT COURT
Following the completion of Mr. Gardner's investigation, the State charged Mr. Darwish with committing three felonies: initiating the theft of property and trafficking in that property, section 812.019(2), a first-degree felony (count one); scheming to defraud and obtaining property thereby, section 817.034(4)(a)(3), a third-degree felony (count two); and cheating by false pretenses, section 817.29, a third-degree felony (count three). The parties agreed to a bench trial. The State nolle prossed count two before trial, and Mr. Darwish was tried on the trafficking-in-stolen-property and cheating charges. The defense challenged the sufficiency of the State's proof with a timely motion for a judgment of acquittal on both charges. The trial court entered a verdict that acquitted Mr. Darwish of the trafficking charge and found him guilty of cheating by false pretenses. Afterward, the trial court adjudged Mr. Darwish to be guilty of cheating and placed him on probation for five years.
The State's main witness on the cheating charge was Lawrence Burrell, a Polk County firefighter. Mr. Burrell was assigned to the Alturas Fire Station. One of Mr. Burrell's duties after the hurricane was distributing relief supplies to residents of the area. Mr. Burrell had known Mr. Darwish before the storm because he had visited Mr. Darwish's nearby store.
Mr. Burrell testified that on his first contact with Mr. Darwish after the hurricane, Mr. Darwish came to the fire station with a shopping cart. On this occasion, Mr. Darwish collected ice and "probably just a couple of cases" of bottled water. Approximately two days later, Mr. Darwish came to the fire station in his van. Mr. Burrell believed that Mr. Darwish picked up more than two cases of water on the second visit "because in the van he can carry a little bit more." The noteworthy feature of Mr. Darwish's second appearance at the fire station was a gratuitous comment that he made to Mr. Burrell, "It's not like I'm going to go and sell out of my store." Mr. Darwish concluded this unsolicited remark with laughter.

*792 III. THE PARTIES' ARGUMENTS
Mr. Darwish argues that the verdict of guilty for cheating is unsupportable because of the absence of any "nexus" between Mr. Darwish's comment noted above and his receipt of the bottled water. In support of this point, Mr. Darwish points out that there was no evidence that his comment induced Mr. Burrell to part with the water. In response, the State characterizes Mr. Darwish's conduct as "beyond words" and "tragic." The State argues that the bottled water was "obviously" not intended for re-sale and was restricted for consumption by victims as part of the hurricane relief effort.

IV. DISCUSSION

A. Introduction
A claim that a person has misappropriated relief supplies intended for the victims of a natural disaster naturally provokes public outrage and condemnation. See, e.g., Wiley v. Ohio/Oklahoma Hearst Argyle Television, Inc., 33 Fed.Appx. 434 (10th Cir.2002) (describing how a woman who was accused of taking supplies from a relief center set up by the Red Cross for tornado victims was dubbed a "relief thief" by a local television station). In this case, we expect that many people would find Mr. Darwish's conduct to be offensive from an ethical point of view. But the question before us is not one of morality. We are called upon to decide whether the trial court's verdict finding Mr. Darwish guilty of cheating by false pretenses is supported by competent, substantial evidence. See Pagan v. State, 830 So.2d 792, 803 (Fla. 2002); Bradford v. State, 460 So.2d 926, 930 (Fla. 2d DCA 1984). To address this question, we turn now to an examination of the relatively obscure offense of cheating.

B. The Cheating Statute
The cheating statute, section 817.29, provides:
Cheating.  Whoever is convicted of any gross fraud or cheat at common law shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
Section 2.01, Florida Statutes (2004), provides, with certain exceptions, that the common and statute laws of England, as of July 4, 1776, are in force in Florida. Therefore, "the English Statute 30 Geo. II c. 24 (1757), the first section of which makes it a crime to obtain money or goods with intent to cheat or defraud by false and untrue pretenses, is the law of this State." State v. Peterson, 192 So.2d 293, 294-95 (Fla. 2d DCA 1966).[1] Cheating by false pretenses may be defined as "[t]he intentional obtaining of both the possession and ownership of money, goods, wares, or merchandise by means of misrepresentations, with the intent to defraud." Black's Law Dictionary 252 (8th ed. 2004).
In order to assess Mr. Darwish's argument that the State failed to prove a prima facie case against him, we must first determine the elements of the offense for which he was convicted. There are only a handful of reported decisions that have addressed Florida's cheating statute. These decisions do not discuss the elements of cheating by false pretenses. Therefore, we must seek guidance concerning the elements of this offense by examining decisions that have construed other Florida statutes relating to obtaining money or property by false pretenses.

*793 C. The Elements of False Pretenses
On the question of the elements of false pretenses, the decision in Finlay v. State, 152 Fla. 396, 12 So.2d 112 (1943), is instructive. In Finlay, the defendant had been convicted of obtaining money under false pretenses, section 817.01, Florida Statutes (1941).[2] In considering the defendant's challenge to his conviction, our supreme court enumerated the five elements of obtaining money under false pretenses: "(1) false representation of a past or existing fact; (2) knowledge of its falsity; (3) intent to defraud; (4) reliance on the misstatement by the other party; and (5) surrender by the other party of property because of the representation." Id. at 113. We conclude that a prima facie case of cheating by false pretenses must include proof of these elements. Here, Mr. Darwish's argument focuses on the element of reliance, and it is to this element that we now direct our attention. Once again, we must rely on decisions concerning offenses analogous to cheating by false pretenses.

D. The Element of Reliance
Deception is the essence of the crime of obtaining property by false pretenses. Ex parte Stirrup, 155 Fla. 173, 19 So.2d 712, 713 (1944). Therefore, proof of "a causal relation between the representation or statement made and the delivery of the property" is required to sustain a conviction for this crime. Id. Where the evidence fails to show that the victim was induced to part with money or property in reliance on a misstatement of fact by the defendant, a conviction for obtaining money or property by false pretenses may not be sustained. See, e.g., Collins v. State, 319 So.2d 135 (Fla. 2d DCA 1975) (reversing conviction for larceny by trick where there was no showing of reliance on any representation made by the defendant). On the other hand, a conviction for such an offense may be upheld where the element of reliance is proven or conceded. See, e.g., Finlay, 152 Fla. 396, 12 So.2d 112 (affirming conviction for obtaining money by false pretenses where defendant's misrepresentations of fact induced donor to make a charitable contribution); Youngker v. State, 215 So.2d 318, 323-24 (Fla. 4th DCA 1968) (affirming conviction for grand larceny by false pretenses where building contractor who obtained construction draw from bank by means of false lien waiver conceded that he knew that the bank would rely on the waiver); Green v. State, 190 So.2d 614 (Fla. 3d DCA 1966) (affirming conviction for grand larceny by obtaining money by false pretenses where the evidence showed that victim would not have given money to defendant absent defendant's false representations). See generally 3 Wayne R. LaFave, Substantive Criminal Law § 19.7(c) (2d ed. 2003) (discussing the element of reliance in connection with the crime of obtaining money or property by false pretenses).

E. The Trial Court's Findings on the Issue of Reliance
In this case, the trial court entered a written verdict stating its findings of fact and conclusions of law.[3] On the issue of *794 reliance, the trial court focused on the gratuitous remark Mr. Darwish made to Mr. Burrell when Mr. Darwish picked up the second load of water in his van. The trial court found:
Albeit that [Mr. Darwish] initiated the conversation with Mr. Burrell, rather than waiting to see if Mr. Burrell was going to specifically question him as to the reason why he was seeking a greater than average quantity (which, pursuant to Mr. Waters, Mr. Burrell's supervisor in the relief operation, would have been standard policy), [Mr. Darwish] specifically obtained the van load of water by telling Mr. Burrell that: "It's not like I'm going to go and sell at my store.", followed by [Mr. Darwish's] laughter at this particular remark. Despite vigorous cross-examination, Mr. Burrell was unshaken in his testimony that [Mr. Darwish] specifically told him this while obtaining the van load of water on this second trip to procure water from Mr. Burrell.
After a thorough review of the record, we conclude that the trial court's finding of reliance is not supported by competent, substantial evidence.
The critical testimony on the issue of reliance came from Mr. Burrell, the fire-fighter on duty when Mr. Darwish picked up the second load of water in his van. In pertinent part, Mr. Burrell testified:
Q. Tell us about your first contact with [Mr. Darwish]?
A. He came up with a shopping cart at that first time that I noticed and he got ice and water.
Q. Do you know how much water he got?
A. No. Not at that time. Probably just a couple of cases. Because that was what we were basically handing out at that time.
Q. Was there a subsequent time that he visited the fire department to get water?
A. I saw him later on. I don't remember how many days, probably a couple days after that. He came up in that van that I saw him in.
Q. How much water did he get that time?
A. It was probably a couple more cases than in the shopping cart because in the van he can carry a little bit more. And the main thing was to pass out because you were trying to get the word out to other people. Thinking that they would pass out to friends and family.
Q. So, he got more than two cases at least that day?
A. Yes, sir.
Q. Okay. At any point during your contact with him, did he make a joke or a comment that you found, at least at this time, in perspective that would be unusual?
A. Yes, sir.
Q. As best you can in his exact words, can you tell us what his comment to you was?
A. It's not like I'm going to go and sell out of my store, ha, ha, ha.
During cross-examination by defense counsel, Mr. Burrell did not provide any further details concerning how Mr. Darwish obtained the bottled water on his second visit to the fire station.
Our review of the record discloses the following pertinent facts. The water was distributed for free. The bottles were not marked to indicate that they were not intended for resale. Persons requesting relief supplies were not asked to sign an application form or to identify themselves to receive water. Although recipients of quantities of water greater than two cases were sometimes asked to explain their intended *795 use of the water, Mr. Burrell did not direct any such inquiry to Mr. Darwish. Thus Mr. Darwish was not required to state his plans for the use of the water before he received it. In addition, the testimony about the timing of Mr. Darwish's comment was vague. Mr. Burrell was not specific about when Mr. Darwish made the comment in relation to the receipt of the water. We do not know if Mr. Darwish made the comment before he received the water, while it was being loaded into his van, or just before he drove away with the cases of water already loaded. Most important, Mr. Burrell did not testify that Mr. Darwish obtained the water by representing to Mr. Burrell that he would not resell it. Mr. Burrell never said that he would have refused to give Mr. Darwish the wateror more than a normal distribution of two casesabsent the comment. Based on these facts, the State did not prove that Mr. Burrell was induced to part with the water in reliance on Mr. Darwish's comment. Thus the State failed to prove an essential element of the offense of cheating by false pretenses.

V. CONCLUSION
We do not condone the conduct of Mr. Darwish that is at issue in this case. Nevertheless, the State failed to carry its burden of proving that he was guilty of cheating by false pretenses. Accordingly, we reverse the judgment and sentence imposed on Mr. Darwish, and we remand this case to the trial court with directions that he be discharged.
Reversed and remanded with directions.
VILLANTI and LaROSE, JJ., Concur.
NOTES
[1] In the Peterson opinion, this court set forth the text of the English statute. 192 So.2d at 295.
[2] Section 817.01 was repealed in 1957. See ch. 57-1, § 24, Laws of Fla. See also Anglin v. Mayo, 88 So.2d 918, 920 (Fla.1956), where the court held that section 817.01 had been superseded by the passage of chapter 26912, Laws of Florida, 1951, cited as section 811.021, Florida Statutes. The crime of obtaining property by false pretenses has been merged into the larceny statute. See id. at 921; Rosengarten v. State, 171 So.2d 591, 594 (Fla. 2d DCA 1965).
[3] We commend the trial court for its detailed twelve-page written verdict. The trial court's thorough analysis of the facts and the law has facilitated this court's review of this case.